Mariano SANTANA, Plaintiff,

v.

DELUXE CORPORATION and John Hancock Mutual Life Insurance Company, Defendants.

No. CIV.A. 94–30111–FHF.

United States District Court,
D. Massachusetts.

June 4, 1998.

Dina E. Fein, Fein, Pearson, Emond & Fein, Springfield, MA, for Mariano Santana, and all others similarly situated, Plaintiffs.

James W. Nagle, Robert M. Hale, Goodwin, Procter & Hoar, Joseph A. Piacquad, Goodwin, Procter & Hoar, Boston, MA, for Deluxe Check Printers, Inc., Defendants.

*MEMORANDUM AND ORDER*

FREEDMAN, Senior District Judge.

## I. INTRODUCTION

Looking to compel his former employer to change its allegedly evil ways, plaintiff Mariano Santana ("Santana") brought a nine-count complaint against defendants Deluxe Corporation ("Deluxe") and John Hancock Mutual Life Insurance Company ("John Hancock") claiming that Deluxe and John Hancock have denied certain health care benefits to participants of a Deluxe employee health insurance benefit plan. Having granted summary judgment to John Hancock on all counts, *see Santana v. Deluxe Corp.*, 920 F.Supp. 249 (D.Mass.1996), the Court now considers motions for summary judgment from both Santana and Deluxe.

## II. FACTS

Santana was employed by Deluxe, a company in the business of printing checks and forms for financial institutions, between November 28, 1977 and November 2, 1988, at its facility in Springfield. Santana became disabled in an industrial accident in April 1988. Under Deluxe's six-month salary continuation plan, he continued to receive weekly salary benefits until November 2, 1988.

In October 1988, he received a letter from Deluxe explaining that he would be terminated if he could not return to work by November 2, 1988. Because Santana could not return, he was terminated. In January 1989, Santana moved from Massachusetts to Puerto Rico. After termination, Santana applied for disability benefits under Deluxe's Long Term Disability ("LTD") Plan. On April 11, 1990, Santana received notification that his disability benefits were approved retroactive to January 1, 1989. Accordingly, he received a lump sum payment covering that period, with no federal income tax withheld from it. He has received health care benefits under the LTD Plan ever since, remitting a premium to Deluxe.

Deluxe requires participants in the LTD Plan to apply for Social Security Disability Benefits ("SSDI") from the federal government to offset weekly salary plan benefits and LTD Plan benefits paid for the same period. In May 1991, the Social Security Administration awarded Santana SSDI benefits, retroactive to the date of his disability in October 1988. At the same time, he was notified that he was entitled to Medicare health insurance starting from October 1990, two years after the date he qualified for SSDI. As a Social Security recipient, Santana was automatically enrolled in Medicare Part A coverage, which provides insurance for hospital treatment, but not in Medicare Part B, which requires recipients to enroll and pay premiums for physician expenses.

When Santana began to collect benefits under the LTD Plan in April 1990, Deluxe notified him that he and his family were enrolled as participants in Deluxe's John Hancock/HMO plan ("the Indemnity Plan" or "Plan"), a health benefit plan funded by employer and participant contributions and managed by John Hancock. In June 1991, Deluxe sent Santana a copy of its 1991 employee handbook, entitled "Checking In with Deluxe," that described the terms of the Indemnity Plan. The terms of the 1991 handbook form the basis of this dispute. Specifically, the handbook contained the following statement under the heading "Submitting a

Claim for a Deluxe Retiree Eligible for Medicare":

> NOTE: The benefits provided by the Deluxe Employee Health Care Plan shall be reduced by an amount equal to the benefits you are entitled to receive under the Medicare Program. As a retiree, when you qualify for Medicare, Medicare then becomes your first line of coverage. It pays first, and the Deluxe Employee Health Care Plan then considers the charges that Medicare didn't cover. The Deluxe plan will pay the difference between what Medicare pays and what the Deluxe plan would have paid alone. So it is very important to enroll for Medicare coverage, both Part A, hospital, and Part B, supplemental, when you become eligible for it in order to have adequate medical coverage. This also applies to former Deluxe employees who become eligible for Medicare due to disability (after two years of disability).

Beginning in November 1991, Santana incurred medical expenses from treatment by physicians and other medical providers, amounting to roughly $1,600. Santana applied to Medicare to cover the expenses but was informed that he could not receive Medicare Part B benefits because he was not enrolled. Deluxe also denied his claim for the expenses under its Indemnity Plan because, according to its interpretation of the handbook language, it considered the services covered by Medicare Part B. Santana did not file a formal written appeal through the Indemnity Plan's process.

In January 1992, Santana applied for Medicare Part B coverage, and became enrolled in July 1992. Deluxe has paid for all other expenses Santana incurred after October 1990 that were not covered by Medicare.

In February 1994, Santana's counsel requested from Deluxe its employee benefit plans in which Santana participated. In response, Deluxe sent plaintiff's counsel portions of its "Checking in with Deluxe" booklets from 1988 to 1993 describing the Indemnity Plan and LTD Plan.

In May 1994, Santana filed a nine-count complaint against Deluxe and John Hancock, alleging an improper denial of benefits (Count Two), failure to provide an adequate summary plan description ("SPD") under 29 U.S.C. § 1022(b) (Count Three), breach of contract (Count Four), violation of the Medicare As Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y(b) (Counts Five and Six), and requesting certification of a class action (Count One), injunctive relief (Count Seven), attorney's fees (Count Eight) and double damages (Count Nine).

In March 1996, the Court granted summary judgment to John Hancock on all counts. The Court now turns to the summary judgment motions before it.

### III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the essential purpose of summary judgment is "to pierce the boilerplate of the pleadings" and appraise the proof to determine whether a trial is necessary. *See Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). When summary judgment is at stake, the Court must scrutinize the record in the light most favorable to the nonmoving party, "indulging all reasonable inferences in that party's favor," *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990), yet disregarding unsupported allegations, unreasonable inferences, and conclusory speculation. *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact percolates through the record and the movant is entitled to judgment as a matter of law, then summary judgment is proper because a trial would serve no useful purpose. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wynne*, 976 F.2d at 794.

In this case, the Court considers each parties' cross motions for summary judgment on their merits. *See Bellino v. Schlumberger Tech., Inc.*, 944 F.2d 26, 33 (1st Cir.1991). Cross motions for summary judgment do not alter the basic Rule 56 standard; they require a determination of whether either par-

ty deserves judgment as a matter of law based on facts that are not disputed. *See Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996); *Wiley v. American Greetings Corp.,* 762 F.2d 139, 141 (1st Cir.1985). As such, cross motions simply demand that all factual disputes and any competing rational inferences be resolved in the light most favorable to the party opposing summary judgment. *See Den Norske Bank v. First Nat'l Bank of Boston,* 75 F.3d 49, 53 (1st Cir.1996); *United States v. City of North Adams,* 777 F.Supp. 61, 66 (D.Mass. 1991).

## IV. DISCUSSION

With no material facts in dispute, this case involves statutory construction and contractual interpretation. The pivotal issue is whether the Deluxe Indemnity Plan violates the MSP statute, 42 U.S.C. § 1395y(b). Counts Five and Six allege that the Indemnity Plan's payment of benefits to him only for expenses not covered by Medicare violates the MSP Act. Deluxe contests this claim, arguing that Santana is not covered by the MSP statute's reach. The determination of this dispute is crucial to the entire suit because Santana's ERISA claims derive from the alleged MSP statutory violations.

### A. *Medicare As Second Payer*

Passed as an amendment to the Social Security Act in 1980, the MSP statute embodies the Congressional objective of reducing the cost of the federal Medicare program by preventing private health insurers from shifting primary health insurance coverage for certain employees from their private benefit plans to the Medicare program. *See United States v. Rhode Island Insurers' Insolvency Fund,* 80 F.3d 616, 622 (1st Cir. 1996) ("The MSP provision, and its implementing regulations, explicitly prohibit private insurers from negotiating or enforcing any insurance-contract term which purports to make Medicare the primary-insurance obligor in lieu of a private insurance carrier, even though authorized by state law."); *Colonial Penn Ins. Co. v. Heckler,* 721 F.2d 431, 435 (3d Cir.1983) (stating that as a "cost reduction measure," the MSP statute mandates that an "insurer is responsible for primary coverage and cannot limit itself to secondary liability because Medicare is available."); *see also* 42 C.F.R. § 411.32(a)(1) ("Medicare benefits are secondary to benefits payable by a third party payer even if State law or the third party payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries.").

As originally drafted in 1986, the pertinent MSP provision mandated that "[a] large group health plan ... may not take into account that an *active individual* ... is entitled to benefits under [the Medicare program]." 42 U.S.C. § 1395y(b)(1)(B)(i) (1988) (repealed 1993) (emphasis added). For enforcement of this payment provision, the MSP statute provided a private cause of action: "There is established a private cause of action for damages (which shall be in amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payments (or appropriate reimbursement) in accordance with [§ 1395y(b)(1) ]." 42 U.S.C. § 1395y(b)(3). The statute defined an "active individual" as "an employee ..., an individual associated with the employer in a business relationship, or a member of the family of any such persons." 42 U.S.C. § 1395y(b)(1)(B)(iv) (1988) (repealed 1993). The statute also defined a "large group health plan" ("LGHP") in accordance with the definition provided by the Internal Revenue Code, 26 U.S.C. § 5000(b)(2): "a plan of, or contributed to by, an employer ... (including a self-insured plan) to provide health care ... to the employees, former employees, the employer, others associated or formerly associated with the employer in a business relationship, or their families, that covers employees of at least one employer." *See* 42 U.S.C. § 1395y(b)(1)(B)(iv)(II) (defining LGHP by reference to IRC's definition).

On August 10, 1993, Congress amended the MSP Act to instruct that "[a] large group health plan ... may not take into account that an individual (or a member of an individual's family) who is covered under the plan by virtue of the individual's *current employment status* with the employer is entitled to

benefits under [the Medicare program]." 42 U.S.C. § 1395y(b)(1)(B)(i) (1994) (emphasis added). The private cause of action remained, and the revised statute also defined "current employment status" exactly as it had defined "active individual": "[a]n individual has 'current employment status' with an employer if the individual is an employee, is the employer, or is associated with the employer in a business relationship." 42 U.S.C. § 1395y(b)(1)(E)(ii) (1994).

Against this statutory backdrop, Santana claims that Deluxe violated the MSP Act by failing to provide for primary payments after structuring its Indemnity Plan to take into account that Santana was entitled to Medicare benefits as an SSDI recipient. Santana's argument hinges on his qualification as "an active individual" under section 1395y(b)(1) from October 1990, when he became entitled to welfare benefits, to August 10, 1993, when the MSP statute was amended, and then as an individual with "current employment status" since August 10, 1993. If Santana was "an active individual" or had "current employment status," then the MSP statute forbade Deluxe from taking Santana's entitlement to Medicare into account—and in fact designating it the primary payer—when coordinating his benefits.

Deluxe asseverates that its coordination of Santana's benefits as secondary to Medicare payments did not violate the MSP statute because Santana, as a former employee since November 1988, does not satisfy either section 1395y(b)(1) qualification during the relevant time periods. Santana responds that although he does not qualify as a "current active employee," *see* Memorandum in Support of Plaintiff's Motion for Summary Judgment at 21, he is covered by both versions of the MSP statute because he is "associated [with Deluxe] in a business relationship," *see* 42 U.S.C. § 1395y(b)(1)(E)(ii) (1994); 42 U.S.C. § 1395y(b)(1)(B)(iv) (1988) (repealed 1993). For the reasons that follow, the Court disagrees that for purposes of MSP statutory coverage the plaintiff was an active individual from between 1988 and 1993, or has had current employment status since the 1993 MSP statutory amendments.

1. *Plain Meaning of the MSP Statutory Language*

As in any case where the Court considers certain contours of a Congressional creation, the first rule of thumb is to read statutory terms, including any provided definitions, according to their plain meaning. *See Bailey v. United States,* 516 U.S. 137, 144–45, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *United States v. Missouri Pac. R.R. Co.,* 278 U.S. 269, 278, 49 S.Ct. 133, 73 L.Ed. 322 (1929). When those terms are clear and unambiguous, the Court assigns them their "ordinary and natural" meaning. *Bailey,* 516 U.S. at 145, 116 S.Ct. 501. If, and only if, "the literal words of the statute create ambiguity or lead to an unreasonable result," then the Court will look to other principles of statutory construction and the underlying legislative history. *See Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 653–54 (1st Cir.1997) (quoting *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir. 1987)), *petition for cert. filed,* 66 U.S.L.W. 3531 (U.S. Feb. 4, 1998) (No. 97–1278); *Oregon Ass'n of Hosp. v. Bowen,* 708 F.Supp. 1135, 1139–40 (D.Or.1989) (examining plain meaning and legislative history of MSP statute).

When drafting the MSP statute, Congress defined "active individual" and "current employment status" in terms of being "associated with the employer in business relationship," but gave no express explanation or definition of the meaning of the latter phrase. *See* 42 U.S.C. § 1395y(b)(1)(E)(ii) (1994); 42 U.S.C. § 1395y(b)(1)(B)(iv) (1988) (repealed 1993). Without that imprecise phrase, Santana's argument that since his termination he has been an "active individual" and has maintained "current employment status" would fall like a house of cards. Based on the premise that "there is an absolute nexus between Santana's (former) employment with Deluxe, and his ongoing coverage through the Deluxe Indemnity Plan," Santana makes the tenuous assertion that the term "current employment status" can apply to a "former employee recipient of LTD benefits pursuant to health and LTD plans established for benefits of Deluxe employees." *See* Memoran-

dum in Support of Plaintiff's Motion for Summary Judgment, at 20–21.

Eschewing this "absolute nexus" approach to statutory interpretation, the Court considers it a matter of fundamental logic that a former employee, like a retiree, is neither active nor currently employed. To his credit, Santana readily admits that he is "clearly not an 'employee' for purposes of establishing 'current employment status.'" *See* Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment at 20. Indeed, Santana is nothing short of an inactive former employee who was terminated from his position at Deluxe over nine years ago. This Court's inquiry would end with Santana's failure to qualify for protection under the MSP statute had Congress left courts only to consider the plain meaning of the primary statutory language. Congress, of course, did not.

■ Santana clings to the ambiguous language of the MSP's statutory definition section to qualify for the statute's protection. As a result, the Court must answer the question of whether the MSP's protection of "an individual associated with the employer in a business relationship" extends to a former employee still receiving his health care coverage through an employer-funded benefit plan.

Santana's argument for a broad interpretation of the phrase "associated with the employer in a business relationship" is not without some appeal. To participate in the Indemnity Plan during the relevant time period, Santana paid monthly premiums for health care benefits. He is correct to point out that those premiums cause "legal and economic rights and obligations" to run between the parties. *See id.* at 23. As a former employee participating in an employee benefit plan, Santana certainly has statutorily created rights under ERISA. The MSP statute, however, only gives express legal rights to active and current employees. Santana's argument falters where he concludes that by paying premiums he has "associated" himself in a "business relationship" with Deluxe within the meaning of the MSP statute because his former employer is "in the business of providing health coverage."

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 4.

First, Deluxe is not in the business of providing health care insurance. *See* 29 U.S.C. § 1144(b)(2)(B) (stating that "an employee benefit plan ... shall [not] be deemed to be an insurance company or other insurer ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts"); *FMC Corp. v. Holliday,* 498 U.S. 52, 61–62, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (holding that self-funded employee benefit plans governed by ERISA are not subject to direct state regulation); *see generally* Laura J. Schacht, *The Health Care Crisis: Improving Access For Employees Covered by Self-Insured Health Plans Under ERISA and the Americans with Disabilities Act,* 45 Wash. U.J. Urb. & Contemp. L. 303 (1994) (discussing framework of ERISA preemption of state regulation of self-insured employee benefit plans). Santana did not simply walk off the street and approach Deluxe about a business relationship whereby Santana would pay Deluxe premiums in return for health insurance after shopping around and concluding that Deluxe's benefit plan was superior to other health insurers. Santana is entitled to participate—and in fact does participate—in the Indemnity Plan because he was enrolled as a former employee receiving LTD benefits, not because he preferred the way Deluxe runs its benefit plan.

Second, the argument for a broad construction of "associated in a business relationship" is refuted by the language defining a LGHP. Under 42 U.S.C. § 1395y(b)(1)(B)(iv)(II), an LGHP provides health care "to the employees, former employees, the employer, others associated or formerly associated with the employer in a business relationship, or their families, that covers employees of at least one employer." In relation to Santana, the Indemnity Plan is a self-insured health care benefit plan that provides health care to a "former employee." Comparison of the definitions of "active individual" and "current employment status" with that of an LGHP reveals that an LGHP

provides coverage to both "former employees" and "others associated or formerly associated with the employer in a business relationship," while both versions of the MSP statute apply to those "associated with the employer in a business relationship" but not "former employees." *Compare* 42 U.S.C. § 1395y(b)(1)(B)(iv)(II), *and* 26 U.S.C. § 5000(b)(2) *with* 42 U .S.C. § 1395y(b)(1)(E)(ii) (1994), *and* 42 U.S.C. § 1395y(b)(1)(B)(iv) (1988) (repealed 1993).

The conclusion that Congress did not intend to cover disabled former employees among those individuals "associated with the employer in a business relationship" is drawn from the principle of construction that " '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Brown v. Gardner*, 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)); *see Eastern Enterprises v. Chater*, 110 F.3d 150, 155 (1st Cir.1997) (applying negative pregnant principle of statutory construction), *cert. granted sub nom Eastern Enterprises v. Appel*, ——— U.S. ———, 118 S.Ct. 334, 139 L.Ed.2d 259 (1997).

■ According to this rule of construction, the inclusion of the term "former employees" in section 1395y(b)(1)(B)(iv)(II), combined with the exclusion of the term in sections 1395y(b)(1)(E)(ii) and 1395y(b)(1)(B)(iv), demonstrates that Congress intentionally excluded "former employees" from the latter sections. As a result, Congress did not intend that an LGHP treat "former employees" as individuals who are "active" or have "current employment status" for purposes of Medicare coverage. Without more, this inference would be a helpful one in resolving this dispute. But there is more here, establishing why the negative pregnant argument should be treated as an interpretive trump card.

In the context of the definition sections, the term "associated" is susceptible of divergent interpretations depending on what constitutes a "business relationship." The term "business relationship" plausibly can be defined in a myriad of ways that extend well beyond individuals actively working or currently employed by the employer subject to the MSP provision. The term is ambiguous because it can be construed to have meanings contradictory to the terms it is intended to define. An individual can be "associated in business relationship" without ever having worked or performed services for an employer.

In the face of ambiguity, because the MSP statute does not expressly include or exclude former employees receiving benefits from its scope, the Court turns to the statute's legislative history to resolve this ambiguity with evidence as to whether Congress meant somehow to precisely define the expansive language of "associated in a business relationship." *See North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 522, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Surveying the legislative landscape results in a firm confirmation that Congress did not intend to include former employees within the reach of the MSP provision.

*2. Legislative History of the MSP Statute*

■ When Congress considered amendments to the MSP statute in the Omnibus Budget Reconciliation Act of 1986, the Senate bill proposed to "amend the Social Security Act to provide that Medicare would be the secondary payer for all Medicare beneficiaries (including disabled and those who buy into Medicare) who elect to be covered by employment based health insurance as a current employee (or family member of such employee) of a large employer." H.R. Conf. Rep. No. 99–1012, at 320 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3607, 3965 (describing section 611 of S. 2706, 99th Cong. (1986)). Specifically, the Senate proposal "would [have] explicitly include[d] under the secondary payer provision those persons with group health coverage who are the employer, former employees under age 65, individuals associated with the employer in a business relationship, or members of the families of any such persons." *Id.* During conferencing, the Senate proposal was modified and agreed to without the language including "former

employees under 65" under the MSP statute's umbrella of protection. *Id.* at 321, *reprinted in* 1986 U.S.C.C.A.N. 3607, 3966.

The deletion of former employees from the definition provision works another principle of statutory construction into the mix. Where Congress incorporates inclusionary language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the inclusion was not intended. *See Taylor v. United States,* 495 U.S. 575, 590, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) ("omission of a pre-existing definition of a term often indicates Congress' intent to reject that definition"); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Russello,* 464 U.S. at 23–24, 104 S.Ct. 296; *State of Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 700 (1st Cir.) ("Deletion, without more, suggests that Congress simply had a change of heart."), *cert. denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994).

Congress's deletion of the term "former employee under age 65" from the text of section 1395y(b)(1)(B)(iv) in 1986 indicates that Congress did not intend the MSP statute to give former employees the same rights as an "active individual." For purposes of the MSP statute, Santana wants this Court to define "associated in a business relationship" to include former employees still participating in an employee benefit plan, but, simply put, "Congress did not write the statute that way." *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). Logic dictates that if Congress intended to include former employees in the definition of "active individual" or "current employment status," then it would have done so expressly, just as it did in defining an LGHP.

### 3. Deference to Administrative Interpretation

■ Finally, in construing a statute, the Court accords great deference to the interpretation of the agency charged with the statute's administration. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Blum v. Bacon,* 457 U.S.

132, 141, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 274–75, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). Here the Department of Health and Human Services' Health Care Financing Administration ("HCFA") enforces the mandates of the MSP statute. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii) (authorizing HCFA to recover Medicare payments from "any entity which is required or responsible to pay ... under a primary plan" for services rendered); *Health Insurance Ass'n of Am., Inc. v. Shalala,* 23 F.3d 412, 415 (D.C.Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1064 (1995).

Just as Congress has not "directly addressed the precise question at issue," *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778, the HCFA has also failed to provide a governing regulation expressly defining the meaning of being "associated with the employer in a business relationship." Instead, the relevant HCFA regulation states that:

An individual has current employment status if—

(1) The individual is actively working as an employee, is the employer (including a self-employed person), or is associated with the employer in a business relationship; or

(2) The individual is not actively working and—

(i) Is receiving disability benefits from an employer for up to 6 months ...; or

(ii) Retains employment rights in the industry and has not had his employment terminated by the employer, if the employer provides the coverage ..., is not receiving disability benefits from an employer for more than 6 months, is not receiving disability benefits from Social Security, and has GHP coverage that is not pursuant to COBRA continuation coverage ....

42 C.F.R. § 411.104(a) (1997).

While the HCFA's definition of "current employment status" under section 411.104(a)(2) extends to individuals not "actively working" for an employer for up to six months after receiving disability benefits, it does not include former employees whose "employment [has been] terminated by the employer" and who have received disability

benefits for more than six months. While shedding no light on the reach of "associated in a business relationship," the regulation supports the conclusion that former employees who were terminated and are receiving SSDI benefits do not have current employment status under the MSP statute.

The HCFA, however, intentionally decided not to define "associated with the employer in a business relationship." In 1995 when the HCFA considered defining the phrase in its regulations, it declined, rejecting the exact interpretation that Santana now requests. *See* Medicare Program; Medicare Secondary Payer for Individuals Entitled to Medicare and Also Covered Under Group Health Plans, 50 Fed.Reg. 45,344, 45,349–50 (1995). Specifically, the HCFA received a comment on its proposed regulations recommending "that individuals who are receiving health care coverage through an employer are associated with the employer in a business relationship regardless of whether they are employees ... [because] employers provide such benefits as a part of a quid pro quo for services." *Id.* at 45,349.

The HCFA responded that it did "not agree that a definition of the term 'individual associated with the employer in a business relationship' is necessary in the regulations ... [because a]ny individual who qualifies for LGHP coverage because of a business relationship with the employer (for example, suppliers and contractors who do business with the employer) is included within the term." *Id.* The agency considered that "[d]efining the term in the manner proposed would bring many former employees, including retirees, who receive benefits from an employer within the scope of the MSP provision for the disabled." *Id.* The HCFA concluded, and this Court agrees, that "Congress clearly did not intend the MSP provision for the disabled to extend to retirees and other former employees, since the term 'former employee under age 65' was specifically deleted from an early draft of legislation on MSP for the disabled." *Id.* (citing S. Rep. 99–348 (1986)); *see supra* at 15–17.

Instead, the HCFA reasoned that "[t]he inclusion of individuals 'associated with the employer in a business relationship' (that is, individuals whose relationship to the employer is based on business rather than on work) demonstrates that the Congress intended that the term 'current employment status' be given the broadest possible application." *Id.* at 45,356. The agency stated that the latter term "encompasses not only individuals who are actively working but also individuals under contract with the employer whether or not they actually perform services for the employer, such as attorneys on retainer, tradesmen and insurance agents." *Id.*

The Court agrees with the HCFA's opinion that the term "associated with the employer in a business relationship" does not reach former employees receiving benefits from an employer. The agency's interpretation of the MSP statutory language to cover those whose work or services for an employer is intermittent to the point that they might be categorized as active or inactive over a given period of time, is based on a reasonable and "permissible construction of the statute." *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. The agency's interpretation reflects the plain language and intent of the MSP provision by ensuring that LGHPs, rather than Medicare, serve as the primary payer for individuals with whom an employer maintains some kind of employment relationship under traditional agency principles, such as independent contractors and authorized agents. *Cf. Perry v. Metropolitan Life Ins. Co.*, 852 F.Supp. 1400, 1407 (M.D.Tenn.1994) (consideration of the plain language and legislative history of the MSP statute "indicates that Congress intended Medicare to be the secondary payer for certain categories of *working* individuals") (emphasis in original), *rev'd on other grounds*, 64 F.3d 238 (6th Cir.1995).

Reviewing the HCFA guidelines leads this Court to conclude that Congress included "associated with the employer in a business relationship" to define employees broadly so that disabled employees would continue to be covered by an employer's health benefit plan during periods, because of their disabilities, when they were not presently performing any work for the employer but still maintained the benefits and indicia of employment and anticipated returning to work in the

future (after, for example, a temporary layoff or sick leave). *See Ridgeway v. Sullivan,* 804 F.Supp. 1536, 1538 n. 2 (N.D.Ga.1992) (quoting 3 Medicare Carriers Manual, U.S. Dept. of Health and Human Services, HCFA–Pub. 14–3, at § 3337 (1988)) ("The question to be decided is whether the employer treats a disabled individual who is not working as an employee, in light of commonly accepted indicators of employee status rather than whether the person is categorized in any particular way by the employer.").

Accordingly, deference to the agency's interpretation and consideration of other principles of statutory construction compel the conclusion that Santana, as a former employee receiving health benefits, does not fall under the umbrella of the MSP's statutory protection for active individuals and those with current employment status. In the final analysis, Deluxe acted lawfully by taking into account Santana's entitlement to benefits when coordinating his health care coverage as a disabled former employee participating in the Indemnity Plan.

As a result, the Court grants summary judgment to the defendant on Counts Five and Six, which allege violations of the MSP statute, Count Seven, which requests injunctive relief to stop the alleged violations, and Count Nine, which requests double damages under 42 U .S.C. § 1395(y)(3)(A) for the alleged violations. Conversely, the plaintiff's motion for summary judgment is denied on these four counts.

## B. *ERISA violations*

Having had his claim for benefits denied by Deluxe's health insurance plan, Santana seeks to invoke the protection of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* In Count Two, Santana claims that Deluxe improperly withheld benefits due him under the Indemnity Plan in violation of 29 U.S.C. § 1132(a) because the Plan wrongfully treated Medicare as Santana's primary payer. Count Three alleges a failure to provide Santana with an adequate summary plan description ("SPD") in violation of 29 U.S.C.

§ 1022. Count Eight requests attorney's fees under 29 U.S.C. § 1132(g).

Deluxe counters that Santana's first claim is barred because he failed to exhaust administrative remedies provided by the Indemnity Plan, and regardless, that Deluxe properly denied his benefit request according to the valid terms of the Indemnity Plan. Deluxe also responds that it provided an adequate SPD, that the request for injunctive relief is not justified, and that Santana is not entitled to attorney's fees.

### 1. *Denial of Benefits*

"Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits," nor does it "establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." *Id.* Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), and "to protect contractually defined benefits," *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

Where benefits are contractually defined, ERISA provides that a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In addition, a participant may "obtain other appropriate equitable relief" to redress an ERISA violation or enforce the terms of the plan. 29 U.S.C. § 1132(a)(3)(B).

The Court reviews ERISA claims arising under section 1132(a)(1)(B) de novo unless the benefits plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v.*

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Because the welfare benefit plan in this case does not "clearly grant discretionary authority to the administrator," the Court will not accord the administrator's decision the deferential, arbitrary and capricious, standard of review. *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993). Instead the Court will look at the denial of benefits claim de novo. *See Recupero v. New Eng. Tel. & Tel. Co.,* 118 F.3d 820, 826–27 (1st Cir.1997) (discussing mechanics of de novo standard of review).

### a. *Exhaustion*

■ ERISA requires that "every employee benefit plan shall ... afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. Consistent with this section, courts have held that exhaustion principles require that employee welfare benefit plan participants must pursue all available administrative remedies prior to filing suit in federal court for benefits under a specific benefits plan. *See Drinkwater v. Metropolitan Life Ins. Co.,* 846 F.2d 821, 825–26 (1st Cir.) (affirming dismissal of contract-based benefit denial claim for failure to exhaust administrative remedies), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *McLean Hosp. Corp. v. Lasher,* 819 F.Supp. 110, 121–23 (D.Mass.1993); *Treadwell v. John Hancock Mutual Life Ins. Co.,* 666 F.Supp. 278, 283–84 (D.Mass.1987); *see also Kross v. Western Elec. Co.,* 701 F.2d 1238, 1243–45 (7th Cir.1983); *Amato v. Bernard,* 618 F.2d 559, 567–68 (9th Cir.1980). Congress has not expressly mandated exhaustion in such cases, however, giving courts a certain degree of discretion to invoke the exhaustion requirement. *See Portela–Gonzalez v. Secretary of the Navy,* 109 F.3d 74, 77 (1st Cir.1997).

In this case, the Indemnity Plan provided for a process by which Santana could have appealed the denial of his claim. The process was clearly spelled out in the 1991 "Checking In With Deluxe" booklet that Santana received. Santana never filed a written appeal of the claim denial through the appropriate administrative channel. He now alleges in his suit, however, that he is "entitled to payment of medical bills for treatment by physicians, pursuant to his participation in the defendant['s] employee benefit plan," Complaint at 7, and asks for, among other things, "damages in the amount of unpaid medical bills," *id.* at 11. Santana should have raised these claims through the perfectly accessible administrative appeal procedures.

Santana first attempts to salvage his cause of action for benefits by arguing that the appeal would have been futile. Yet he provides no evidence that the plan appeal process is a futile administrative route. Without any evidence of futility, his bare assertion does not defeat the strong public policy reasons underlying the exhaustion doctrine. *See McLean Hosp. Corp.,* 819 F.Supp. at 121–22 (describing policy reasons); *DePina v. General Dynamics Corp.,* 674 F.Supp. 46, 49 (D.Mass.1987).

■ Santana next argues that he need not have exhausted the available administrative remedies because he has alleged a benefit claim which requires interpretation of the ERISA statute. Several district court decisions from the District of Massachusetts have distinguished between plan-based and statute-based claims, requiring plaintiffs to exhaust all administrative options on a claim involving contractual interpretation of a benefit plan—a task best left to a plan administrator or trustee—but not on a claim that entails statutory interpretation. *See McLean Hosp. Corp.,* 819 F.Supp. at 121–22; *Treadwell,* 666 F.Supp. at 283–84. The First Circuit has not addressed the issue, *see Drinkwater,* 846 F.2d at 825–26 (stating that "exhaustion is required for claims which are purely contractual," but failing to address argument that exhaustion unnecessary for benefit claim based on ERISA rights), while the circuits are split, *compare Kross,* 701 F.2d at 1243–45, *and Mason v. Continental Group, Inc.,* 763 F.2d 1219, 1227 (11th Cir. 1985), *cert. denied,* 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986), *with Zipf v. AT & T Co.,* 799 F.2d 889, 891–93 (3d Cir.1986),

*and Amaro v. Continental Can Co.,* 724 F.2d 747, 751–52 (9th Cir.1984).

 This Court agrees with the Seventh and the Eleventh Circuits that strong public policy reasons—most prominently to render meaningful the Congressional mandate that all ERISA plans include an appeal process—compel plaintiffs to exhaust all benefit denial claims, regardless of their nature. Any commentary on the issue, however, would be mostly academic. Santana bases his benefits claim on the Indemnity Plan's alleged violation of the MSP statute. Because the Indemnity Plan does not violate the MSP statute by treating its benefits secondary to Medicare, *see supra* at 172–73, the Court concludes that as a matter of law the benefits claim cannot succeed on this theory. Exercising the latitude Congressional silence provides when dealing with exhaustion questions, *see Darby v. Cisneros,* 509 U.S. 137, 153–54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), the Court will address the other arrow in Santana's benefit denial quill because, upon close analysis, the Court concludes that it too misses its mark.

### b. *Unenforceable SPD Provision*

Santana relies on Count Three of his Complaint to support Count Two. He contends that Deluxe wrongfully denied him benefits because the "Checking in With Deluxe" booklet, as a summary plan description, inadequately informed him of the circumstances in which it would deny claims, thereby violating section 1022 of ERISA. *See* 29 U.S.C. § 1022 (requiring SPDs to contain descriptions of "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits"); *Andersen v. Chrysler Corp.,* 99 F.3d 846, 856 (7th Cir.1996) ("To the extent any plan participant or beneficiary is harmed by a plan administrator's violation of [section 1022], ERISA [section 1132] grants that beneficiary a right of action to recover any benefits due him and to enjoin the act or practice which violates ERISA or the terms of the plan."). Santana asserts that the Medicare coordination clause is unenforceable against him because it did not adequately inform him that the Indemnity Plan would pay benefits "secondary to Medicare Part B even if the participant does not elect coverage under Medicare Part B." Memorandum in Support of Plaintiff's Motion for Summary Judgment, at 4.

Specifically, Santana contends that Deluxe wrongfully withheld benefits under the Plan's language stating that benefits would be "reduced by an amount equal to the benefits [the participant was] entitled to receive under the Medicare Program." He argues that while he may have been "eligible" for Medicare Part B when Deluxe denied his claim for benefits, he was not yet "entitled" to Medicare coverage because he had not yet enrolled and paid the required premiums. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 8.

Such linguistic splitting of hairs is exactly the contractual interpretation properly addressed through the administrative appeal that Congress mandated in every benefits plan. *See Drinkwater,* 846 F.2d at 826. Regardless, the Court disagrees with the thrust of this hybrid of statute-based and plan-based section 1132 claims involving section 1022.

 SPDs are considered part of the ERISA plan documents, governing the contractual rights granted in employee benefit plans. *See Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988); *see also McKnight v. Southern Life & Health Ins. Co.,* 758 F.2d 1566, 1570 (11th Cir.1985) (an SPD simplifies and explains the complex document that makes up the benefit plan). An SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022. Congress enacted these statutory requirements "to arm employees with enough information to enable them to enforce their rights." *Helwig v. Kelsey–Hayes Co.,* 93 F.3d 243, 249 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 690, 136 L.Ed.2d 613 (1997); *see also Brumm v. Bert Bell NFL Retirement Plan,* 995 F.2d 1433, 1439 (8th Cir.1993) (SPD "must not mislead, misinform, or fail to inform participants and

beneficiaries of the requirements of the full plan").[1]

 In construing the benefit provisions of an ERISA regulated plan governed by federal common law, *see Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.1990), the Court is guided by "common-sense canons of contract interpretation." *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir.1989). When ERISA plans contain unambiguous language, the Court construes them according to their "plain and natural meaning." *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 178 (1st Cir.1995); *see Wickman*, 908 F.2d at 1084 (ERISA contract "terms must be given their plain meanings, meanings which comport with the interpretations given by the average person.").

As the Supreme Court has explained, the law of trusts provides guidance when interpreting ERISA plan documents: "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.' " *Firestone*, 489 U.S. at 112, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 4 cmt. d (1959)); *see Bachelder v. Communications Satellite Corp.*, 837 F.2d 519, 522 (1st Cir.1988) (ERISA "plan must be interpreted in light of its apparent purposes, its structure and its history"). The need for "other evidence" depends on the relative ambiguity of the plan provision in question. *See Rodriguez–Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 586 (1st Cir.1993). "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).

In this case, Santana received the 1991 "Checking in with Deluxe" handbook, the relevant SPD. As set out earlier, the language at issue was situated under the heading "Submitting a Claim for a Deluxe Retiree Eligible for Medicare":

> NOTE: The benefits provided by the Deluxe Employee Health Care Plan shall be reduced by an amount equal to the benefits you are entitled to receive under the Medicare Program. As a retiree, when you qualify for Medicare, Medicare then becomes your first line of coverage. It pays first, and the Deluxe Employee Health Care Plan then considers the charges that Medicare didn't cover. The Deluxe plan will pay the difference between what Medicare pays and what the Deluxe plan would have paid alone. So it is very important to enroll for Medicare coverage, both Part A, hospital, and Part B, supplemental, when you become eligible for it in order to have adequate medical coverage. This also applies to former Deluxe employees who become eligible for Medicare due to disability (after two years of disability).

 In October 1990, Santana was entitled to Medicare Part B coverage because he was a qualified SSDI recipient. The SPD informed him that his benefits would be reduced by what he was qualified to receive from Medicare. Reading the language of this offset provision as a whole, the Court concludes that the SPD unambiguously provides that the Indemnity Plan will not pay expenses covered by Medicare to disabled former employees. The SPD makes it clear that a disabled former employee needs to enroll in Medicare Part B upon qualification because the Indemnity Plan will not pay for expenses for which the employee is entitled to be paid through Part B. Why else would it be "very important" to enroll for Part B in order to have "adequate medical coverage"? The language is not reasonably prone to an interpretation that the Indemnity Plan will pay for expenses covered by Medicare Part

**1.** According to 29 C.F.R. § 2520.102–2, an SPD: (1) must not mislead or misinform; (2) must describe limitations as prominently as benefits; (3) must not minimize limitations; and (4) must either disclose limitations in close conjunction to benefit provisions or provide page numbers on which restrictions are described adjacent to a description or summary of benefits.

B when a disabled former employee who is entitled to Part B benefits fails to enroll. By contrast, it is readily understood from this language that a participant who does not enroll in Medicare Part B when eligible will not recoup payment from the Indemnity Plan for expenses that Medicare Part B would cover.

Santana attacks the SPD from several angles. He argues first that the SPD inadequately notified him of his benefit rights because the provision's heading indicates it applies to retirees, causing a disabled former employee like himself to avoid reading it. Given that Santana also received two letters from Deluxe outlining how the terms of the SPD's Medicare coordination provision affected him as a disabled former employee, as discussed *infra*, the Court finds this assertion wholly unpersuasive.[2]

▆ Next he argues the SPD suffers from the failure to alert beneficiaries sufficiently of the consequences of neglecting to obtain Medicare Part B. Contrary to this assertion, the SPD informs disabled former employees who do not enroll in Medicare Part B when they are eligible that they do not have "adequate medical coverage," and that the Indemnity Plan's coverage does not overlap the reach of the Medicare program. The Court considers that when fairly read as a whole, the 1991 SPD, which Santana received before seeking physician's services, reasonably informed participants that the Indemnity Plan did not cover benefits covered by Medicare, regardless of whether the participant obtained Part B coverage.

▆ Finally, Santana asseverates that the provision is ambiguous and should be construed against its drafter to nullify its application to his case. Even if the provision was open to reasonable differences of interpretation, the Court disagrees with the plaintiff's suggested method. For a Court facing ambiguous contractual terms, the First Circuit has instructed that construing them against their drafter—the doctrine of contra

proferentem—does not generally apply in ERISA disputes. *See Rodriguez–Abreu*, 986 F.2d at 586 ("in the ERISA context, we generally do not construe ambiguous terms against the drafter"); *Allen v. Adage, Inc.*, 967 F.2d 695, 701 (1st Cir.1992) ("in most ERISA cases, resort to contra proferentem contradicts the combined principles of the law of trusts and de novo review"). Instead, "[i]f the language of the contract is ambiguous, we turn to surrounding circumstances, undisputed extrinsic evidence, to divine the parties' intent." *Rodriguez–Abreu*, 986 F.2d at 586.

▆ Consideration of the extrinsic evidence squarely supports the plain reading of the SPD provision. When Santana received Deluxe's October 1998 letter explaining his possible November termination, he also received an explanation of Deluxe's LTD Plan for which he was eligible. In pertinent part, it read:

> Two years after the date you qualify for Social Security disability benefits you become eligible for Medicare Part A (hospital benefits) and Part B (physician's benefits). You will be automatically enrolled for Part A by the Social Security Administration, and there is no charge for it. However, you will have an option to take or not take Part B. There is a charge for Part B which is currently $24.80 a month. When you become eligible for Medicare—Part B, you should enroll for it because at that time the Medicare plan becomes primary and our John Hancock/HMO plan will only pay those charges not covered by Medicare.

The inference reasonably drawn from this language indicates that Deluxe's employee benefit plan will not cover expenses covered by Medicare Part B, regardless of whether an eligible recipient actually enrolls in it. Similarly, Deluxe enclosed a letter to Santana when sending him the 1991 SPD. The letter, addressed to "Former Deluxe Employees With Extended Health Insurance

---

**2.** The 1991 SPD provision should have indicated more clearly in its heading that the provision also applied to disabled former employees receiving Medicare benefits, but the provision is binding nonetheless and Deluxe brought it to the attention of disabled former employees like Santana through supplemental memoranda. A reasonably prudent employee would have read and reviewed this important provision.

Coverage as the Result of Long Term Disability," read, in relevant part:

> Enclosed is your copy of the 1991 "Checking In With Deluxe." Of particular interest to you is the Health Care Plan section, beginning on page 87. It describes the medical coverage provided by the John Hancock Employee Health Care Plan.
>
> Just a reminder to you. Two years after you qualify for Social Security Disability Benefits you become eligible for Medicare Part A (hospital benefits) and Part B (physician's benefits). When you become eligible for Medicare you must enroll for it because at that time the Medicare plan becomes your "first line" coverage, and your John Hancock plan will only consider those charges not covered by Medicare. The person qualified for Medicare submits to Medicare first, and what Medicare does not pay is sent to John Hancock for consideration.

It is readily inferred from this letter that the Indemnity Plan required disabled former employees to enroll in Medicare Part B because the Plan would not pay for those expenses that Part B covers. This extrinsic evidence conclusively refutes Santana's misguided conclusion that the Medicare coordination provision was inapplicable to his situation because he "was not 'entitled' to receive Medicare Part B benefits until July, 1992 ... [and that while he] may have been eligible for Medicare Part B, he was not entitled, because he had not enrolled and paid the premiums to become entitled." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 8. Given the extrinsic evidence and the plain meaning of the Medicare coordination provision, this Court has "no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined." *Burnham*, 873 F.2d at 489.

The SPD adequately disclosed the Indemnity Plan's treatment of Medicare as the primary payer for disabled former employees. Santana could have understood from the SPD that his benefits would be limited by the Medicare coordination provision, and acted to gain "adequate coverage" by enrolling in Medicare Part B for a nominal fee. As a result, the SPD did not mislead, misinform, or fail to inform Santana of the Indemnity Plan's treatment of Medicare coverage. Even had the SPD misled him, Santana has not alleged or attempted to show that he detrimentally relied on the SPD in choosing not to enroll in Medicare Part B or in seeking physician's services. *See Bachelder*, 837 F.2d at 523 (participant who fails to show detrimental reliance upon misleading SPD may not recover under ERISA); *Govoni v. Bricklayers, Masons and Plasterers, Int'l Union of America, Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir.1984) (plaintiff "must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description.").

Simply put, Santana had adequate information to understand his rights under the Plan. *See Alexander v. Primerica Holdings Inc.*, 967 F.2d 90, 94 (3d Cir.1992) ("Summary plan descriptions must warn employees of adversity."); *Lorenzen v. Employees Retirement Plan of the Sperry and Hutchinson Co.*, 896 F.2d 228, 236 (7th Cir.1990) ("the law is clear that the plan summary is not required to anticipate every possible idiosyncratic contingency that might affect a particular participant's or beneficiary's status"); *Stahl v. Tony's Bldg. Materials, Inc.*, 875 F.2d 1404, 1408–09 (9th Cir.1989) ("Summary plan descriptions ... should focus ... upon describing general rules in a way that allows the ordinary employee to understand when and where opportunity beckons and danger lurks"); *Chambless v. Masters, Mates & Pilots Pension Plan*, 772 F.2d 1032, 1040 (2d Cir.1985) (requiring SPD to explain "full import" of provisions affecting employee), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986); *Daniel v. International Bhd. of Teamsters*, 561 F.2d 1223, 1249 n. 58 (7th Cir.1977) ("employees should be able to infer from information in the plan description that there is a risk of loss, and perhaps the nature of the risk"), *rev'd on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).

As a result, the Court holds that Santana deserves no relief under section 1132 for denial of benefits because Deluxe did not

violate 29 U.S.C. § 1022. Accordingly, the Court grants summary judgment to Deluxe on Counts Two, Three, and Eight.[3] Consequently, the Court denies Santana's motion on those counts.[4]

### C. Contract Claim

■ On Count Four, Deluxe moves for summary judgment by arguing that Santana's common law contract action is preempted by ERISA. See 29 U.S.C. § 1144(a). Recognizing the expansive sweep of ERISA's preemption provision, the Court will grant summary judgment on this Count. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding that state breach of contract action preempted because it relates to employee benefit plan); Alessi v. Raybestos–Manhattan, Inc., 451 U.S. 504, 521–26, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (state laws are preempted by ERISA insofar as they are related to any employee benefit plan covered by ERISA).

### D. Class Certification

Count One of the Complaint, as well as a subsequent motion, request the certification of a class action of plaintiffs similarly situated to Santana. Having determined that Santana is not entitled to judgment as a matter of law, the Court notes that even if it had denied Deluxe's motion for summary judgment, Santana's motion for class certification cannot succeed.

A district court may rule on the merits of a summary judgment motion before deciding the class certification issue under Rule 23 of the Federal Rules of Civil Procedure. See Floyd v. Bowen, 833 F.2d 529, 534–35 (5th Cir.1987); . Christensen v. Kiewit–Murdock Inv. Corp., 815 F.2d 206, 214 (2d Cir.), cert denied, 484. U.S. 908, 108 · S.Ct. 250, 98 L.Ed.2d 209 (1987); Marx v. Centran Corp., 747 F.2d 1536, 1552 (6th Cir.1984), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); Wright v. Schock, 742 F.2d 541, 543–44 (9th Cir.1984); Vervaecke v. Chiles, Heider & Co., 578 F.2d 713, 719–20 (8th Cir.1978); Crowley v. Montgomery Ward & Co., 570 F.2d 877, 879 (10th Cir. 1978). While several courts have simply declined to address class certification motions after granting summary judgment against a plaintiff, see, e.g., Acker v. Provident Nat'l Bank, 512 F.2d 729, 732 n. 5 (3d Cir.1975), this Court prefers to decide the motions simultaneously, see Wofford v. Safeway Stores, Inc., 78 F.R.D. 460, 476–77 (N.D.Cal.1978).

■ The Court need not tarry. Even assuming that the four prerequisites of Rule 23(a) can be established—which is questionable given that Santana has not shown that any other similarly situated Plan participant was denied benefits—the plaintiff has not shown that this case satisfies Rule 23(b). Santana has not shown that separate actions would create a risk of inconsistent judgments and incompatible standards of conduct for the defendant, as the plaintiff has pointed to a disinclination to pursue legal action against

---

3. Rather than amending his complaint, Santana alleges for the first time in his summary judgment memoranda separate ERISA violations under 29 U.S.C. §§ 1024, 1132(c). Section 1024(b) mandates that plan administrators provide participants with an SPD within 90 days after they first receive benefits, as well as with updated SPDs as they are amended. Section 1132(c) gives a court discretion to fine administrators up to $100 a day for failing to comply with a participant's request for plan-related information. Plaintiff has failed to seek leave to plead these new causes of action under Fed.R.Civ.P. 15(a), which provides for the amendment of pleadings by leave of court. See Span East Airlines, Inc. v. Digital Equipment Corp., 486 F.Supp. 831, 835 (D.Mass.1980). Accordingly, the Court will not address them. Even if these allegations were included in the complaint, the Court notes that the plaintiff does not allege any harm arising from alleged violations of ERISA reporting pro-

cedures and he has not shown any indication that he detrimentally relied or was prejudiced by any violations. See Govoni, 732 F.2d at 252 (collecting cases requiring reliance and prejudice to entitle employees to monetary relief for employer's procedural violations of ERISA); see also Kreutzer v. A.O. Smith Corp., 951 F.2d 739, 743 (7th Cir.1991) (employer's failure to comply with ERISA's reporting procedures excused because no showing of bad faith or active concealment).

4. To the extent that Santana requests consequential damages in Count Three, the Court notes that the Supreme Court has held that ERISA does not offer remedy for compensatory damages when a plan administrator fails to provide benefits due. See Massachusetts Mutual, 473 U.S. at 142, 105 S.Ct. 3085.

Deluxe on the part of others similarly situated to him as disabled former employees taking part in the Indemnity Plan. *See* Fed. R.Civ.P. 23(b)(1)(A). Nor has the plaintiff shown that a class action is superior to his individual action for injunctive relief to re-write Deluxe's SPD, as an injunction would have affected all Indemnity Plan participants. *See* Fed.R.Civ.P. 23(b)(3). As a result, the Court DENIES plaintiff's motion for certification of a class.

## V. CONCLUSION

Having burrowed through the dense thicket of ERISA summary plan descriptions in this case, the Court arrives with the legal conclusions that Deluxe's employee health insurance benefit plan does not violate the Medicare as Secondary Payer Statute, that Deluxe has not wrongfully denied Santana's claim for benefits, and that Deluxe's SPD does not violate ERISA. Accordingly, the Court GRANTS the defendant's motion for summary judgment in its entirety, and DENIES the plaintiff's cross motion for summary judgment in its entirety.

It is So Ordered.