**Dorothy WHITEHOUSE, Plaintiff,**

v.

**RAYTHEON COMPANY and Metlife, Inc., Defendants.**

**Civil Action No. 08cv11764–NG.**

United States District Court, D. Massachusetts.

Nov. 5, 2009.

James F. Kavanaugh, Jr., Constance M. McGrane, Kathryn T. Rogers, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA, Kevin J. Murphy, Attorney at Law, Chelmsford, MA, for Defendants.

### MEMORANDUM AND ORDER RE: MOTIONS FOR JUDGMENT ON THE RECORD

GERTNER, District Judge:

## I. INTRODUCTION

Plaintiff Dorothy Whitehouse ("Whitehouse") brings suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to challenge the denial of her application for Short Term Disability ("STD") benefits by Raytheon Company ("Raytheon"), her employer, and MetLife, Inc. ("MetLife"), the

STD Plan Administrator. Whitehouse left work after suffering a psychotic episode; MetLife denied her application for STD benefits and rejected her subsequent appeal. Whitehouse alleges that she was disabled under the terms of her insurer's Short Term Disability Plan ("the Plan") and that MetLife's denial of her claim was therefore arbitrary and capricious. The Court agrees, for the reasons described below. Whitehouse's Motion for Judgment on the Pleadings (document # 13) is **GRANTED.** MetLife's Motion for Judgment on the Record (document # 14) is **DENIED.**

## II. BACKGROUND

Dorothy Whitehouse was a management assistant at Raytheon for eighteen years. She participated in the company's Short Term Disability Basic Benefit Plan ("STD Plan"), which pays income replacement at seventy-five percent of weekly base pay for up to ten weeks to eligible employees. Whitehouse supplemented her coverage with STD Plus Coverage, which provides for the remaining twenty-five percent. The STD Plan provides short term disability payments to employees who are "disabled," defined as "[u]nder the regular care and attendance of a doctor"[1] and "[u]nable to perform all the essential elements of [the employee's] regular job with reasonable accommodation" because of a "non-work-related illness or injury." Administrative Record ["AR"] 038. The Plan is a self-insured plan; MetLife is the claims administrator. MetLife, as administrator, has discretionary power to interpret Plan provisions and determine questions arising under the Plan. AR 015.

On August 23, 2007, while at work, Whitehouse experienced a severe attack of paranoia related to her boss and coworkers. She became "suspicious of her colleagues, feeling exploited and deeply injured by their continuing slighting of her efforts." AR 156. Whitehouse left work and scheduled an emergency appointment with her therapist, Allan Anderson ("Anderson"), a licensed social worker. AR 166. On August 28, 2007, Whitehouse filed a claim for STD benefits with MetLife.

### A. Initial Denial

On September 6, 2007, Anderson, who had been Whitehouse's therapist for several years, submitted a short letter to MetLife describing the incident at Whitehouse's work. He stated that he continued to see Whitehouse and relayed that she "reports to continually feeling easily exhausted, unable to sustain her focus and scared." AR 172. Anderson encouraged a transfer from her work environment. Whitehouse was also being treated by Dr. Harold Zeckel ("Dr. Zeckel"), a psychiatrist. He submitted his session notes to MetLife. The August 30, 2007, entry included a few statements from Whitehouse about her condition, including "I started feeling paranoid" and "Now no energy and tired." AR 166

A MetLife representative spoke with Anderson on September 7. Anderson informed him that Whitehouse had a "mental breakdown" and that he had seen her twice since the incident and she was doing better. Anderson told him that Whitehouse had a history of bipolar disorder and major depression. AR 078. The MetLife representative also conducted a phone interview with Whitehouse. Whitehouse told him that her therapist had told her to take a leave of absence from work. She said that September 6 was the first day she had left the house since her appointment with her therapist and that both her

---

1. The parties do not dispute that Whitehouse was under the regular care of a doctor.

psychiatrist and therapist told her not to think about work. AR 080.

Whitehouse's husband called the Met-Life representative on September 25 to let him know that Whitehouse had changed psychiatrists because she was unhappy with Dr. Zeckel and was now seeing Dr. Chand Bhan ("Dr.Bhan"). Dr. Bhan had doubled the dosage of one of her medications, Risperdal. AR 087. That day, the MetLife representative consulted with Dr. Peter Sugerman ("Dr.Sugerman"), a board certified psychiatrist. Dr. Sugerman opined that Whitehouse seemed to be remaining out of work in order to avoid dealing with her supervisor and the possibility of a recurrence of her paranoia attack. He concluded that there was no evidence of a continuing impairment. AR 088. On September 26, after the MetLife representative had made his recommendation to deny the claim, Anderson called to update him on Whitehouse's condition. Anderson stated that Whitehouse did not present with any further paranoia since the work incident but did continue to present anxiety and depression. AR 091.

On September 27, 2007, MetLife sent Whitehouse a letter notifying her of its decision to deny her STD claim because "the clinical data [did] not support the existence of a condition that would render [her] totally disabled and unable to perform the essential elements of [her] job." AR 164. It notified Whitehouse that Met-Life had spoken to Anderson but incorrectly asserted that MetLife had requested information from Dr. Zeckel and had not received any. AR 163. MetLife found that she was disabled from August 23 through August 30 but that her file did not support continuing disability beyond then. The STD Plan's waiting period, however, extended through August 30, so Whitehouse was not eligible to receive any benefits. AR 164.

## B. Appeal

Whitehouse appealed the denial and asked her doctors to submit additional information to support her claim. AR 155. Anderson submitted a letter on October 1 further detailing Whitehouse's condition. Anderson reported that Whitehouse's attack at work was "sudden and severe. The paranoid ideation became pervasive...." AR 156. Anderson further stated that he had diagnosed Whitehouse with "major depressive disorder with psychotic features."[2] AR 156. "The onset was similar to a post-traumatic stress disorder incident, being triggered or re-activated by the behavior of her boss and colleagues." Anderson continued:

> Since the onset of this episode, Ms. Whitehouse has continued to feel very depressed. She suffers from sustained fatigue.... Her sleeping is greatly disturbed. Her ability to concentrate and make decisions is impaired.... Ms. Whitehouse's mental health is clearly worsened from pre-episode state, to where she is significantly impaired, which ... impairs her ability to concentrate and work. Ms. Whitehouse is still clearly not mentally or emotionally capable of returning to work at this time....

AR 156–57.

MetLife had Dr. Marcus Goldman ("Dr.Goldman"), a board certified psychia-

---

**2.** Major depression with psychotic features is "a condition in which a person experiences depression along with reduced contact with reality (psychosis). This can take the form of false beliefs (delusions) or seeing or hearing something that isn't really there (hallucina-tions)." U.S. Nat'l Library of Medicine & Nat'l Institutes of Health, Medline Plus, Major Depression with Psychotic Features, *http://www.nlm.nih.gov/medlineplus/ency/article/000933.htm* (Jan. 15, 2009).

trist, review Whitehouse's appeal. Dr. Goldman issued an assessment on October 17, 2007, in which he concluded that "there is no sufficiently documented evidence that she has a formal thought disorder that would preclude work or functionality. The claimant is capable of driving, she performs her activities of daily living, and she manages her finances." AR 147. MetLife sent Anderson a copy of Goldman's report on October 18 and informed him he had ten days to respond.[3] AR 141. Despite this, MetLife sent Whitehouse a letter denying her appeal four days later on October 22. AR 124.

The denial stated "it is our determination that the information does not support your inability to perform your job duties after August 23, 2007." It repeatedly stated that there was a lack of evidence of Whitehouse's loss of functionality and asserted that her "global functionality is intact." AR 126.

Anderson responded on October 24, within the ten-day time period. He wrote that he "found several errors in [Goldman's] report and wish[ed] to clarify the misinformation contained therein." AR 136. He disagreed with Goldman's assessment that Whitehouse did not have functional limitations. Anderson asserted that "[t]here clearly was debilitating cognitive functioning impairment observed and reported." AR 136.

> By the very definition and nature of this diagnosis, one would be unable to work effectively, and could not function normally, until such time their emotion and mental health were recovered and strong enough to sustain the rigors of full-time work again, especially returning to work in the same environment which contributed initially to the breakdown.

AR 136. He reasserted that Whitehouse's depression and fatigue continued and that she "remain[ed] sufficiently impaired and unable to return to work at this time." AR 137. In contrast to Goldman's statements about Whitehouse's ability to function, Anderson wrote that she "barely manages daily living (some days are better than others), can drive occasionally, but is still unable to manage her finances without assistance." AR 137. Anderson stated that he was "surprised" that his and Dr. Bhan's reports were not taken to support Whitehouse's "serious functional limitations. . . . Mrs. Whitehouse was NOT able to function professionally (or personally), with such a major formal thought disorder as major depression with psychosis." AR 137.

At MetLife's request, Dr. Goldman reviewed Anderson's letter. He also spoke with Dr. Bhan on the phone. In the conversation, Dr. Bhan reported that Whitehouse "had a psychotic episode and was not able to function." Dr. Goldman wrote that "Dr Bahn [sic] strongly supports her debility." AR 121. Dr. Goldman submitted an updated assessment on November 7, in which he concluded that in his opinion, Whitehouse's inability to function was still not sufficiently supported. AR 121. He stated that despite Anderson and Bhan's assertions about Whitehouse's lack of functionality, they had noted the opposite in their conversations with him. AR 121–22.

MetLife sent Whitehouse a letter affirming their denial on November 9. AR 114. The letter repeated much of the October 22 letter. It did not address Anderson's letter and merely reported back Dr. Whitehouse had changed psychiatrists.

3. MetLife also sent a copy to Dr. Zeckel, despite being informed three weeks earlier that

Bhan's conversation without addressing any of his clinical assertions.

Whitehouse now seeks judicial review under 29 U.S.C. § 1132(a)(1)(B), which allows an employee with an insurance plan governed by ERISA to recover benefits due to her under the terms of the plan. She seeks $52,152.31—what she argues is the amount of short term and long term disability benefits owed to her, health insurance payments, and legal fees. The defendants and the plaintiff have filed cross-motions for judgment on the administrative record [documents #13 & 14].

## III. DISCUSSION

### A. *Standard of Review*

■ Where a participant in an ERISA-governed plan challenges an administrator's decision to deny benefits under 29 U.S.C. § 1132(a), a court reviews the denial de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan gives discretion to the administrator or fiduciary, the court reviews the decision under an arbitrary and capricious standard. *Id.; Brigham v. Sun Life of Canada*, 317 F.3d 72, 81 (1st Cir.2003). Here, the Plan gives discretionary authority to the Plan administrator. It provides:

> Benefits under this Plan will be paid only if the Claims Administrator decides in its sole discretion that the claimant is entitled to them. The decisions of the Claims Administrator shall be conclusive and binding on all persons, unless a court of competent jurisdiction determines that such decision was arbitrary and capricious.

AR 015. Therefore, the Court must apply the arbitrary and capricious standard of review. While this standard is deferential, it does not mean court review will amount to a mere rubber stamp. *Lopes v. Metropolitan Life Ins. Co.*, 332 F.3d 1, 5 (1st Cir.2003). The administrator's decision will be upheld if it was "reasoned and supported by substantial evidence" in the record. *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir.2004). Substantial evidence is "evidence reasonably sufficient to support a conclusion." *Id.*

### B. *Review of Short Term Disability Benefits Denial*

■ MetLife's denial of Whitehouse's appeal was arbitrary and capricious. It repeatedly mischaracterizes the findings of Whitehouse's doctors, fails to address important evidence in the record, and does not support its factual assertions.

■ MetLife issued its original denial of Whitehouse's appeal on October 22, only four days after sending Dr. Goldman's report to Anderson, despite informing Anderson that he had ten days to respond. AR 135. The denial merely catalogs (and sometimes mischaracterizes) statements made by Anderson and then repeatedly concludes that Whitehouse's functioning was "intact." AR 126. MetLife writes that there was "a lack of evidence of a formal thought disorder" despite Anderson's diagnosis of major depressive disorder with psychotic features. AR 159. While plan administrators are not required to accord special weight to a treating therapist's opinion, they cannot "arbitrarily refuse to credit a claimant's reliable evidence," including the opinions and diagnoses of a treating doctor. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). At the very least, MetLife must examine Anderson's clinical diagnosis and

give reasons for rejecting it. Here, Met-Life simply ignores the diagnosis.

MetLife writes that it is not clear that Whitehouse's "pharmocotherapy has been particularly aggressive since there is a lack of psychiatric notes or other narrative notes for review." AR 126. This is not entirely correct. MetLife did have a letter from Anderson and psychiatric notes from Dr. Zeckel in which they list Whitehouse's medications. Further, Whitehouse had only seen Dr. Zeckel a few times and was unhappy with his treatment. She switched to Dr. Bhan in late September. Whitehouse's husband told the MetLife representative that Dr. Bhan had increased her Risperdal dosage. Dr. Bhan did not have an opportunity to respond to Dr. Goldman's report because a copy was erroneously sent to Dr. Zeckel (AR 140), despite being informed three weeks earlier that Whitehouse had changed psychiatrists. There is no evidence that Dr. Bhan had any opportunity to review Dr. Goldman's assessment.

The denial asserts that "there is a lack of any convincing data that would establish a cognitive dysfunction," yet in all of his letters and conversations, Anderson listed several of Whitehouse's symptoms that would support a cognitive disability, including inability to focus and make decisions as well as his clinical diagnosis of major depression with psychosis. While MetLife is not required to accept his statements as true, to dismiss a treating licensed therapist's claims as a complete lack of convincing information is arbitrary and capricious. The denial letter also concludes that there was "no evidence of suicidal ideation, homicidal ideation, mania, or aggressive behavior," (AR 126) but nowhere does it say that any of these is required to be considered "disabled" within the terms of the Plan.

MetLife's November 9 supplemented denial further demonstrates MetLife's failure to meaningfully consider the evidence submitted. MetLife does not address any of the new information provided and seems to have merely copied and pasted its reasoning and conclusion from the prior letter. It does not address any of the evidence raised in Anderson's letter. The only reference to Anderson's supplemental evidence is one sentence stating that Anderson disagreed with Dr. Goldman's report. It continues to selectively refers to parts of Anderson's notes while ignoring Anderson's corrections. Though MetLife does not have to defer to Anderson's opinion, when Anderson is correcting MetLife's characterization of statements he made, it cannot indiscriminately ignore his account. In addition, the letter merely parrots back Dr. Bhan's conversation without addressing any of his clinical assertions. Perhaps most egregious of all, it misquotes Dr. Bhan as stating that Whitehouse "[was] able to function" AR 116 when, in fact, he said "she was *not* able to function." AR 121 (emphasis added).

MetLife failed to change or update many of its factual conclusions in response to the new information. For example, the letter states that Whitehouse was "cognitively intact, and apparently activities of daily living, managing money and driving are intact" (AR 126) but nowhere gives the basis for that conclusion. In fact, Anderson wrote exactly the opposite. "She barely manages daily living … can drive occasionally, but it still unable to manage her finances without assistance." AR 137. MetLife also repeats the assertion that Whitehouse's "global functionality is intact" (AR 126) with no evidence to support it and substantial evidence to the contrary. Regardless of whether MetLife found Whitehouse to be "disabled" within the terms of the Plan, she was certainly not "intact," that is, unimpaired in any

way. MetLife writes in the denial letter, "It is not clear why [Whitehouse] could not return to work." AR 116. Yet Anderson and Dr. Bhan gave several reasons why Whitehouse was psychologically unable to return. "She suffers from sustained fatigue with little physical exertion ... Her ability to concentrate and make decisions is impaired." AR 156–57. "She was paranoid about her boss. . . ." AR 121.

MetLife mischaracterizes Whitehouse's impairment as simply "related to [her] dissatisfaction in the work place." AR 116. MetLife minimizes Whitehouse's condition as avoiding a job in which she is unhappy. Anderson compared Whitehouse's paranoid attack at work to a "post-traumatic stress disorder incident" which was "triggered or re-activated by the behavior of her boss and colleagues." AR 156. If Whitehouse was unable to return to work because of a fear of another psychotic episode, it was not avoidance of work but evidence of a fragility of condition in which even "normal" activities like office work could cause another severe attack of paranoia. Anderson explains as much in his letter:

> By the very definition and nature of this diagnosis, one would be unable to work effectively, and could not function normally, until such time their emotional and mental health were recovered and strong enough to sustain the rigors of full-time work again, especially returning to work in the same environment which contributed initially to the breakdown.

AR 136. Whitehouse's paranoia about returning to work was not tantamount to her avoiding her disability but was part and parcel of the disability.

MetLife arbitrarily disregarded the opinion of two treating therapists that Whitehouse was unable to function, and it failed to consider important evidence of her disability. It misquoted Whitehouse's doctors and cherry-picked or took out of context statements made. The denials continued to press factual inaccuracies even after being informed of the errors. For these reasons, MetLife's decision was not reasoned or supported by substantial evidence.

## C. *Long Term Disability Benefits*

■ Whitehouse also seeks Long Term Disability ("LTD") benefits. To qualify for long term disability benefits, a claimant must first receive the full ten-week period of STD benefits. AR 042. Whitehouse did not receive STD benefits for the full period, so MetLife did not review Whitehouse's claim for LTD benefits. In most circumstances, claimants must exhaust their administrative remedies before filing suit. *Santana v. Deluxe Corp.*, 12 F.Supp.2d 162, 174 (D.Mass.1998). Since arbitrary and capricious review must take place on the basis of a record, and there is no record here, the Court cannot review Whitehouse's LTD benefits claim.

## IV. CONCLUSION

For the reasons described above, Whitehouse's Motion for Judgment on the Pleadings (document # 13) is **GRANTED.** MetLife's Motion for Judgment on the Record (document # 14) is **DENIED.** The Court awards Whitehouse STD benefits due to her under the terms of the Plan for the period between August 31, 2007, and October 24, 2007. The Court has chosen to award unpaid benefits and not to remand because it cannot conceive of what additional evidence MetLife could need; its denial was unreasonable. "[A] plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir.2001). The Court re-

mands to the Plan administrator with instructions to accept new evidence for review to determine whether Whitehouse qualifies for STD benefits beyond that period, and if applicable, LTD benefits. Costs are awarded to Whitehouse.

**SO ORDERED.**