2021 IL App (1st) 200395
No. 1-20-0395

SECOND DIVISION
Filed: May 11, 2021

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PAUL MCCAFFREY, MARGARET MCCAFFREY, and CHRISTOPHER MCCAFFREY, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | No. 19 CH 6258 |
| v. | ) ) ) | The Honorable |
| THE VILLAGE OF HOFFMAN ESTATES, | ) ) | Neil H. Cohen, Judge Presiding. |
| Defendant-Appellee. | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs Paul McCaffrey, Margaret McCaffrey, and Christopher McCaffrey appeal from the trial court's dismissal with prejudice of their complaint, pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 619 (West 2018)). Plaintiffs argue that the trial court erred in concluding that defendant, Village of Hoffman Estates, was not obligated under section 10(a) of the Public Safety Employee Benefits Act (Benefits Act) (820 ILCS 320/10 (West 2014)) to pay the insurance premiums for Margaret and Christopher after they became eligible for Medicare coverage. Plaintiffs also argue that the trial court erred in concluding that

they could not seek recovery for the unpaid premiums under the Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2014)). For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        Plaintiffs instituted this action by the filing of their complaint in May 2019. In that complaint, they alleged the following. Paul was a full-time police officer for defendant's police department. On July 8, 2002, Paul was severely injured in the line of duty and was disabled as a result of his injury. Paul applied for and received a disability pension based on his injury. He also applied for health insurance benefits for him and his family—his wife, Margaret, and his dependent son, Christopher—under the Benefits Act, which defendant granted on February 9, 2006.

¶ 4        At some date unspecified in the complaint, Margaret and Christopher became eligible for Medicare based on disability. For the years 2015 through 2018, Margaret opted out of Medicare, Part B. On or about May 25, 2018, defendant notified plaintiffs that it would stop paying insurance benefits for Margaret and Christopher and seek recoupment from plaintiffs' insurer, Blue Cross Blue Shield of Illinois (BCBS), for the insurance premiums paid from 2015 to 2018. At some point after June 1, 2018, defendant stopped providing insurance to Margaret and Christopher. Defendant asserted that Margaret's and Christopher's Medicare eligibility relieved it of paying any further insurance benefits for them under the Benefits Act. In addition, at some point after June 1, 2018, defendant informed BCBS that it had paid premiums in error for the years of 2017[1] through 2018 and requested reimbursement of all premiums paid for Margaret and Christopher during those years. In response, BCBS reimbursed defendant for the premiums at issue and requested and received reimbursement from Margaret's and Christopher's medical providers for medical

_____

[1] It is unclear whether plaintiffs intended to allege that defendant sought recoupment of premiums paid between 2017 and 2018 or between 2015 and 2018, as there are multiple references to both time periods in the complaint. Because the specific years do not affect our decision in this matter, we need not resolve this discrepancy.

expenses BCBS had paid on Margaret's and Christopher's behalf. In turn, Margaret's and Christopher's medical providers sought payment of the medical expenses directly from plaintiffs.

¶ 5    In count I of the complaint, plaintiffs alleged that Margaret's and Christopher's Medicare eligibility was not sufficient to relieve defendant of its obligation to pay their health insurance premiums under the Benefits Act and requested that the trial court enter a judgment of mandamus, mandating that defendant pay the health insurance premiums for Margaret and Christopher from 2015 forward. In count II, plaintiffs sought a declaratory judgment, declaring that defendant was obligated under the Benefits Act to pay the health insurance premiums of Margaret and Christopher from 2017[2] forward. Counts III and IV alleged that defendant violated the Wage Act by failing to pay Margaret's and Christopher's health insurance premiums and by seeking recoupment of health insurance premiums paid to BCBS.

¶ 6    Before proceeding further, we pause to clarify some of plaintiffs' factual allegations, so as to avoid confusion in our discussion of defendant's motion to dismiss and the parties' subsequent arguments on appeal. Although plaintiffs alleged in their complaint that defendant paid insurance premiums on behalf of Christopher from 2015 to 2018, in subsequent filings, plaintiffs clarified that defendant provided coverage for only Margaret during that time and not Christopher. Accordingly, the recoupment defendant sought from BCBS was for premiums paid on behalf of Margaret. It appears, however, that plaintiff contends that defendant did not provide coverage for Christopher during that time due to his Medicare eligibility, but that defendant should have.

¶ 7    In July 2019, defendant filed a motion to dismiss plaintiffs' complaint under section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2018)). In that motion, defendant argued that

---

[2]Again, this appears to have been a typographical error in the complaint, but it does not affect our analysis in this matter.

plaintiffs' claims should be dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 2018)) because, under the Benefits Act, defendant was not required to pay the health insurance premiums for Margaret and Christopher after they became eligible for Medicare coverage. In addition, defendant argued that plaintiffs' Wage Act claims should be dismissed under section 2-615 of the Code (735 ILCS 5/2-615 (West 2018)) because plaintiffs had failed to plead or attach an employment contract or agreement to their complaint and because plaintiffs had failed to plead that Paul was not paid "final compensation" under the Wage Act.

¶ 8        In response, plaintiffs argued that Margaret's and Christopher's Medicare eligibility alone did not relieve defendant of its obligation to pay their health insurance premiums because mere access to other coverage (without taking advantage of it) was not sufficient to reduce plaintiffs' health insurance benefits under the Benefits Act. In addition, plaintiffs argued that Medicare was only a secondary payer for Margaret and Christopher, because Paul retained "current employment status" with defendant while on disability and, accordingly, their Medicare eligibility could not be taken into consideration in coordinating benefits. Plaintiffs also contended that defendant was obligated to provide at least the basic insurance agreed to in the collective bargaining agreement with the police union. With respect to their Wage Act claims, plaintiffs argued that they did not need to plead or attach an employment contract or agreement, and even if they did, an employment agreement was created by law when defendant employed Paul as a police officer. Finally, plaintiffs argued that they did not need to plead that the insurance premiums were final compensation, because they qualified under the Wage Act as wage supplements.

¶ 9        The parties continued to debate their respective positions in defendant's reply and plaintiffs' surresponse.

¶ 10      On January 27, 2020, the trial court issued its memorandum and order. In that order, the trial court concluded that plaintiffs' complaint warranted dismissal with prejudice under section 2-619 of the Code because defendant was not obligated to pay insurance premiums for Margaret and Christopher under the Benefits Act where they were eligible for Medicare. The trial court rejected plaintiffs' claim that Medicare was a secondary payer. The trial court observed that the determination of whether Medicare was a secondary payer turned on the question of whether Paul had "current employment status" with defendant. The trial court concluded that he did not have "current employment status" with defendant, because he was not actively working for defendant and was not associated with defendant in a business relationship. In so concluding, the trial court noted that Paul's employment relationship with defendant terminated upon the award of his line-of-duty disability pension and that the fact that he was subject to recall for emergency duty under the Illinois Pension Code  (40 ILCS 5/3-116 (West 2018)) did not confer employment status on him, because that condition stemmed simply from the Pension Board's jurisdiction over pensions.

¶ 11      Although the trial court concluded that the entire complaint was subject to dismissal under section 2-619 of the Code for these reasons, it also concluded that counts III and IV were also subject to dismissal under section 2-615 of the Code on the basis that plaintiffs failed to allege the existence of an employment contract or agreement under the Wage Act. Additionally, the trial court concluded that counts III and IV failed because health insurance benefits under the Benefits Act do not constitute wages or wage supplements under the Wage Act, in that they are post-employment benefits that are granted only after an employee has been terminated.

¶ 12      Plaintiffs then instituted this timely appeal.

¶ 13                                    II. ANALYSIS

¶ 14        On appeal, plaintiffs argue that the trial court erred in dismissing their complaint because (1) Margaret's and Christopher's Medicare eligibility alone did not relieve defendant of its obligations to pay their health insurance premiums under the Benefits Act and (2) the unpaid premiums constituted wage supplements under the Wage Act and did not require proof of an employment contract or agreement. We address each of these contentions in turn.

¶ 15        Defendant filed its motion to dismiss pursuant to section 2-619.1 of the Code. Section 2-619.1 of the Code permits a litigant to combine motions to dismiss pursuant to sections 2-615 and 2-619 of the Code in a single filing. 735 ILCS 5/2-619.1 (West 2018). The section 2-619 portion of defendant's motion to dismiss was brought pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2018)), which provides for the dismissal of a complaint on the basis that "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." In making such a motion, the movant admits the legal sufficiency of the complaint but asserts that an affirmative defense or some other matter defeats the claims contained therein. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003).

¶ 16        A motion to dismiss under section 2-615 of the Code raises the question of whether the complaint's allegations, viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 348 (2003). The complaint should be dismissed only if it is clearly apparent that the plaintiff can prove no set of facts that would entitle him to relief. *Id.* at 349.

¶ 17        Whether addressing a motion to dismiss under section 2-615 or section 2-619, a trial court must accept all well-pleaded facts of the complaint as true and must draw all reasonable inferences from those facts in favor of the nonmoving party. *Edelman, Combs & Latturner v. Hinshaw &*

*Culbertson*, 338 Ill. App. 3d 156, 164 (2003). Our standard of review of motions to dismiss brought under either section is *de novo*. *Id.*

¶ 18                                   A. Benefits Act

¶ 19        The trial court dismissed plaintiffs' entire complaint under section 2-619(a)(9) of the Code on the basis that defendant was not obligated under the Benefits Act to pay the health insurance premiums of Margaret and Christopher after they became eligible for Medicare. Plaintiffs contend this was error because Paul retained "current employment status" with defendant even after receiving his disability pension and, therefore, Medicare was only a secondary payer. As a secondary payer, plaintiffs contend, Medicare could not be used to reduce plaintiffs' benefits under the Benefits Act. We conclude that the trial court correctly found that Paul did not retain "current employment status," and, thus, Medicare was not merely a secondary payer for Margaret and Christopher. Rather, it was primary and thereby relieved defendant of its obligation to pay insurance premiums for Margaret and Christopher under the Benefits Act.

¶ 20        Section 10(a) of the Benefits Act provides as follows:

"An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who *** suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority or until the end of the calendar year in which the child reaches the age of 25 if the child continues to be dependent for support or the child is a full-time or part-time student and is dependent for support. The term 'health insurance plan' does not include supplemental benefits that are not part of the basic group health insurance plan. If the injured employee subsequently dies, the employer shall

continue to pay the entire health insurance premium for the surviving spouse until remarried and for the dependent children under the conditions established in this Section. However:

(1) Health insurance benefits payable from any other source shall reduce benefits payable under this Section." 820 ILCS 320/10(a) (West 2018).

It is apparent from the plain language of this provision—and the parties do not dispute—that defendant's obligation to provide health insurance benefits for plaintiffs is reduced or eliminated by health insurance benefits payable from another source. The question here is whether Margaret's and Christopher's mere eligibility for Medicare—as opposed to the actual receipt of Medicare benefits—relieves defendant of its obligation to provide health insurance for them.[3]

¶ 21    In *Pyle v. City of Granite City*, 2012 IL App (5th) 110472, the Fifth District addressed the question of whether the defendant city's obligation to provide health insurance benefits under the Benefits Act lasted the lifetime of the injured plaintiff firefighter. The Fifth District concluded that although the Benefits Act generally contemplates the payment of benefits for the lifetime of the employee, where the employee lives to become Medicare eligible, the payment of his or her benefits will be reduced or cease. *Id.* ¶¶ 23-24. This is because Medicare benefits are health insurance benefits payable from another source under section 10(a)(1) of the Benefits Act. Therefore, once an employee is eligible for Medicare benefits, the benefits payable by the employer under the Benefits Act are reduced. *Id.* ¶ 26. The employee in *Pyle* argued that his Medicare eligibility could not completely extinguish his employer benefits because the Benefits Act provides that those benefits only be "reduce[d]" by benefits payable by other sources. The Fifth District rejected this argument, stating:

---

[3]Defendant's obligation to provide health insurance benefits for Paul is not at issue in this appeal.

"Pyle argues that the benefits payable to him cannot cease, however, because the plain language of section 10(a) requires that the benefits payable be 'reduce[d],' not extinguished. If the City had been paying premiums for Pyle and his spouse, and only Pyle had become Medicare eligible, the benefits payable under section 10(a) of [the Benefits Act] would have been reduced only by the amount due for Pyle's premium. The City would have continued to pay health insurance premiums for his spouse under the section's conditions. However, because the City here paid premiums solely for Pyle, Pyle's benefits were reduced in their entirety when he became eligible for Medicare benefits. The City was no longer required to pay the entire premium of the employer's health insurance plan on his behalf. The plain language of the statute supports this conclusion." *Id.* ¶ 27.

Under the *Pyle* decision, health insurance benefits a person receives under the Benefits Act are reduced in their entirety by that person's eligibility for Medicare; that person's eligibility for Medicare, however, does not reduce the health insurance benefits under the Benefits Act received by other family members.

¶ 22        Plaintiffs argue that the *Pyle* decision is inapplicable because it did not address the situation where Medicare is only a secondary payer of health insurance benefits, which plaintiffs contend is the situation here. The federal Medicare Secondary Payer Act (Secondary Payer Act) provides with respect to disabled individuals in a large group health plan,[4]

"A large group health plan *** may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this subchapter

---

[4]There is no dispute between the parties that the group health plan provided by defendant qualifies as a large group health plan.

under section 426(b) of this title." 42 U.S.C. § 1395y(b)(1)(B)(i) (2018). In other words, Medicare is a secondary payer for services that are covered under "[l]arge group health plans *** and that cover Medicare beneficiaries who are under age 65, entitled to Medicare on the basis of disability, and covered under the plan by virtue of the individual's or a family member's current employment status with an employer." 42 C.F.R. 411.100(a)(1)(iii) (2018).

Accordingly, when Medicare is a secondary payer, large group health plans may not "take into account" an individual's Medicare coverage by failing to pay primary health insurance benefits or by terminating coverage. 42 U.S.C. § 1395y(b) (2018); 42 C.F.R. 411.108(c) (2018).

¶ 23    According to plaintiffs, because Paul received health insurance benefits under the Benefits Act by virtue of his "current employment status" with defendant even after receiving a disability pension, Medicare was only a secondary payer of benefits for Margaret and Christopher, and defendant could not refuse to provide primary coverage to them based on their Medicare eligibility. Pursuant to the applicable regulations, an individual has coverage by virtue his current employment status if the individual has group health plan or large group health plan coverage based on his or her employment and the individual has current employment status with that employer. 42 C.F.R. 411.104(c) (2018). Under the Secondary Payer Act, an individual has "current employment status" if the individual "is an employee, is the employer, or is associated with the employer in a business relationship." 42 U.S.C. § 1395y(b)(1)(E)(ii) (2018). The regulations clarify the definition of "current employment status" as follows:

"An individual has current employment status if—

(1) The individual is actively working as an employee, is the employer (including a self-employed person), or is associated with the employer in a business relationship; or

(2) The individual is not actively working and—

(i) Is receiving disability benefits from an employer for up to 6 months (the first 6 months of employer disability benefits are subject to FICA taxes); or

(ii) Retains employment rights in the industry and has not had his employment terminated by the employer, if the employer provides the coverage (or has not had his membership in the employee organization terminated, if the employee organization provides the coverage), is not receiving disability benefits from an employer for more than 6 months, is not receiving disability benefits from Social Security, and has [group health plan] coverage that is not pursuant to COBRA continuation coverage [citation]. Whether or not the individual is receiving pay during the period of nonwork is not a factor." 42 C.F.R. 411.104(a) (2018).

¶ 24                          B. Associated in Business Relationship

¶ 25        Plaintiffs argue that Paul has "current employment status" with defendant because he is associated in a business relationship with defendant. In support, plaintiffs rely on section 3-116 of the Pension Code (40 ILCS 5/3-116 (West 2018)), which provides as follows:

"A police officer whose duty is suspended because of disability may be summoned to appear before the [Pension Board], and to submit to an examination to determine fitness for duty. The officer shall abide by the board's decision. If a police officer retired for disability, except one who voluntarily retires after 20 years' service, is found upon medical examination to have recovered from disability, the board shall certify to the chief of police that the member is no longer disabled and is able to resume the duties of his or her position. In case of emergency, a disabled police officer may be assigned to and shall perform such

duty without right to compensation as the chief of police or chief officer of the municipality may direct."

According to plaintiffs, because Paul was subject to being called for examinations and to perform police duties in case of an emergency, he maintained a business relationship with defendant that conferred on him "current employment status" under the Secondary Payer Act. As a result, plaintiffs argue that this requirement that Paul be ready, willing, and able to respond for emergency duty distinguishes this case from *Pyle* because *Pyle* involved a firefighter, and disabled firefighters are subject to different rules regarding their reinstatement to duty following disability. We acknowledge that the rules for disabled police officers are different than those for firefighters; however, because we conclude that the fact Paul was subject to recall for emergency duty did not constitute a business relationship with defendant, the distinction between police officers and firefighters in this context is one without a difference.

¶ 26        Although the Secondary Payer Act, the relevant regulations, and the Medicare manual do not provide any further definition or insight into the term "business relationship," federal and Illinois[5] case law provides some assistance in assessing whether Paul was associated with defendant in a business relationship. First, in the case of *Santana v. Deluxe Corp.*, 12 F. Supp. 2d 162, 169 (D. Mass. 1998), the court was faced with the question of whether a disabled former employee who continued to receive health benefits from an employer-funded plan was "associated in a business relationship" with the employer under the Secondary Payer Act. Ultimately, the

[5]Plaintiffs argue that whether Paul maintained "current employment status" under the Secondary Payer Act should be determined under federal law and that Illinois principles of what constitutes an employment relationship are irrelevant. Although we agree that the nature of Margaret's and Christopher's Medicare coverage depends on whether Paul maintains "current employment status" with defendant as that term is used in the Secondary Payer Act, we also believe that Illinois case law is relevant in ascertaining the precise nature and characteristics of the relationship between a municipality and police officer receiving benefits under the Benefits Act, a state statute.

*Santana* court answered this question in the negative. In doing so, the court first addressed the former employee's argument that a business relationship existed between him and the employer because he paid monthly premiums for the health care benefits and his employer was in the business of providing health coverage. *Id.* The *Santana* court rejected this argument, concluding that the employer (a check and financial form printing company) was not in the business of providing health care coverage:

> "Santana [former employee] did not simply walk off the street and approach Deluxe [employer] about a business relationship whereby Santana would pay Deluxe premiums in return for health insurance after shopping around and concluding that Deluxe's benefit plan was superior to other health insurers. Santana is entitled to participate—and in fact does participate—in the Indemnity Plan because he was enrolled as a former employee receiving LTD benefits, not because he preferred the way Deluxe runs its benefit plan." *Id.*

¶ 27    The *Santana* court then considered the Secondary Payer Act's definition of "current employment status" in relation to other relevant statutes. The court observed that the term "large group health plan" as used in the Secondary Payer Act means "a plan of, or contributed to by, an employer or employee organization *** to provide health care (directly or otherwise) to the employees, former employees, the employer, others associated or formerly associated with the employer in a business relationship, or their families." 26 U.S.C. § 5000(b)(2) (2018); 42 U.S.C. § 1395y(b)(1)(B)(iii) (2018) ("In this subparagraph, the term 'large group health plan' has the meaning given such term in section 5000(b)(2) of the Internal Revenue Code of 1986, without regard to section 5000(d) of such Code."). Although this definition of "large group health plan" specifically includes former employees as a category separate and distinct from people associated in a business relationship with the employer, the definition of "current employment status" does

not do the same. Instead, the definition of "current employment status" mentions only employees, employers, and those associated in a business relationship with the employer; there is no mention whatsoever of former employees. Relying on the canon of construction providing that where Congress uses specific language in one section of a statute but not in another section, the court presumes that Congress acted intentionally and purposely in omitting that language. In *Santana*, the court concluded that the exclusion of "former employees" in the definition of "current employment status," in light of its specific inclusion in the definition of "large group health plan" was intentional. Therefore, "[a]s a result, Congress did not intend that [a large group health plan] treat 'former employees' as individuals who are 'active' or have 'current employment status' for purposes of Medicare coverage." *Santana*, 12 F. Supp. 2d at 170.

¶ 28     The *Santana* court also went on to observe that the term "associated in a business relationship" was ambiguous, given that one could have a business relationship without ever having worked or performed services for an employer, which would be inconsistent with having "current employment status." *Id.* Accordingly, the court turned to the legislative history of the Secondary Payer Act. In doing so, the court found persuasive that in discussing the 1986 amendments to the Secondary Payer Act, the original Senate proposal would have specifically included "former employees under age 65" in the secondary payer provision. That language, however, was later removed. *Id.* at 170-71. The court observed that this triggered the interpretation principle that "[w]here Congress incorporates inclusionary language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the inclusion was not intended." *Id.* at 171. Despite the employee's attempt to include former employees still participating in an employee benefit in the definition of "associated in a business relationship," the *Santana* court concluded that Congress simply did not write it that way. *Id.* Instead, "[l]ogic dictates that if Congress

intended to include former employees in the definition of *** 'current employment status,' then it would have done so expressly, just as it did in defining [a large group health plan]." *Id.*

¶ 29    Finally, the court discussed the regulations issued by the Department of Health and Human Services' Health Care Financing Administration (HCFA) on the Secondary Payer Act. First, the court observed that although the HCFA's definition of "current employment status" included people who were not actively working for the employer for up to six months after receiving disability benefits, it did not include former employees whose employment had been terminated and who had received disability benefits for more than six months. *Id.* at 171-72. Most telling, however, was the court's discussion of the HCFA's rejection of a proposal that it define "associated in a business relationship" to include individuals who received health care benefits from an employer, regardless of whether they are employees. *Id.* at 172.

> "The HCFA responded that it did 'not agree that a definition of the term "individual associated with the employer in a business relationship" is necessary in the regulations … [because a]ny individual who qualifies for LGHP coverage because of a business relationship with the employer (for example, suppliers and contractors who do business with the employer) is included within the term.' [Citation.] The agency considered that '[d]efining the term in the manner proposed would bring many former employees, including retirees, who receive benefits from an employer within the scope of the [Secondary Payer Act] provision for the disabled.' [Citation.] The HCFA concluded, and this Court agrees, that 'Congress clearly did not intend the [Secondary Payer Act] provision for the disabled to extend to retirees and other former employees, since the term "former employee under age 65" was specifically deleted from an early draft of legislation on [the Secondary Payer Act] for the disabled.' [Citations.]

Instead, the HCFA reasoned that '[t]he inclusion of individuals "associated with the employer in a business relationship" (that is, individuals whose relationship to the employer is based on business rather than on work) demonstrates that the Congress intended that the term "current employment status" be given the broadest possible application.' [Citation.] The agency stated that the latter term 'encompasses not only individuals who are actively working but also individuals under contract with the employer whether or not they actually perform services for the employer, such as attorneys on retainer, tradesmen and insurance agents.' " *Id.*

¶ 30    Based on this extensive review and discussion of the Secondary Payer Act, its legislative history, and administrative interpretation and regulations, the *Santana* court concluded that "associated in a business relationship" was not intended to encompass former employees receiving health insurance benefits from the employer. *Id.* Instead, the court concluded:

"Congress included 'associated with the employer in a business relationship' to define employees broadly so that disabled employees would continue to be covered by an employer's health benefit plan during periods, because of their disabilities, when they were not presently performing any work for the employer but still maintained the benefits and indicia of employment and anticipated returning to work in the future (after, for example, a temporary layoff or sick leave)." *Id.* at 172-73.

¶ 31    Given the lack of a clear definition of "associated in a business relationship" in the Secondary Payer Act or its related regulations, we find the in-depth analysis of *Santana* persuasive. Accordingly, we, too, conclude that an employee whose active employment with an employer has ended because of disability is not associated in a business relationship with the employer simply by virtue of the receipt of employer-funded health benefits.

¶ 32         During oral arguments on this matter, plaintiffs contended that *Santana* is distinguishable from the present case because in *Santana*, the only connection between the former employee and the employer was the former employee's receipt of disability health benefits. In contrast, plaintiffs argue, here Paul and defendant are connected not just by the receipt of disability benefits, but also by Paul's requirement that he respond for emergency duty and his retention of employment rights. As will be discussed below, however, neither of these confer "current employment status" on Paul.

¶ 33         Plaintiffs argue that Paul's claim to being associated in a business relationship with defendant is not based solely on his receipt of health insurance benefits under the Benefits Act but also on his ongoing obligation to respond to Pension Board examinations and emergency duty. He attempts to characterize his obligation in this respect as a business exchange with defendant, in which he remains available for examinations and emergency duty in exchange for health insurance benefits under the Benefits Act. The problem with plaintiffs' position, however, is that Paul's obligation to respond is not the price he pays in exchange for his health insurance benefits under the Benefits Act. Instead, Illinois courts have repeatedly made it clear that this obligation to respond is merely a condition placed on Paul's receipt of health insurance benefits under the Benefits Act by virtue of the Pension Board's jurisdiction over recipients of those benefits. See, *e.g.*, *Greenan v. Board of Trustees of the Police Pension Fund of Springfield*, 213 Ill. App. 3d 179, 186-87 (1991) ("These obligations [to submit to medical examinations and be subject to emergency recall] do not arise from plaintiff's employment status with the police department but rather from the [Pension] Board's jurisdiction over one receiving disability pension benefits. If plaintiff refuses to comply with the [Pension] Code's provisions, the [Pension] Board may terminate his benefits."); *Hahn v. Police Pension Fund*, 138 Ill. App. 3d 206, 213 (1985) ("[T]he duty of the pension recipient to respond under section 3-116 of the Pension Code must be based

on the right of the disabled officer to receive the pension funds. Should he refuse to submit to a board examination or perform emergency duties, it seems apparent that his disability pension payments may be terminated."); see also *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 191 (1992). In other words, Paul and defendant did not negotiate an agreement under which Paul agreed to provide emergency services in exchange for health insurance coverage in the same way that an employee contracts to provide work in exchange for wages and benefits. Instead, Paul was awarded health insurance benefits under the Benefits Act pursuant to statute, due to his line-of-duty disability. In turn, Paul's obligation to respond to requests for examination or recall for emergency duty is simply a statutory condition of his continued receipt of those statutory benefits. Nothing about this interaction suggests any sort of business relationship between Paul and defendant.

¶ 34        Plaintiffs point to two examples from the Medicare Secondary Payer Manual to support their position that Paul retained "current employment status" with defendant. First, plaintiffs point to the Medicare Manual provision regarding volunteers:

> "Volunteers are considered to have current employment status when they perform
> services or are available to perform services for an employer and receive remuneration
> *for their services*. *** Also, remuneration may be of a monetary or nonmonetary nature.
> Benefits, including health benefits that a volunteer receives, are considered
> remuneration." Ctrs. for Medicare & Medicaid Servs., Medicare Secondary Payer (MSP)
> Manual § 50.1(D) (Mar. 22, 2019), https://www.cms.gov/regulations-and-
> guidance/guidance/manuals/downloads/msp105c01.pdf (last visited Apr. 29, 2021)
> [https://perma.cc/NKS5-7LLD] (Medicare Manual).

We find this provision unpersuasive here because even volunteers under this provision have current employment status only if they receive remuneration for their services. As discussed above, Paul's receipt of health insurance benefits under the Benefits Act is not payment for his being available to respond to Pension Board requests for examination and emergency duty; it is a condition of his receipt of those benefits, which are awarded to him under statute as a result of his line-of-duty disability.

¶ 35    Second, plaintiffs point to the provision titled "Re-employed Retirees and Annuitants," which provides:

> "If a retiree or annuitant returns to work even for temporary periods, the employer is required to provide the same coverage under the same conditions that is furnished to other employees (*i.e.*, non-retirees). Thus, an employer is required to provide primary coverage for a re-employed retiree if the amount of work the individual performs (based on hours, productivity, etc.) would be sufficient to earn the employee coverage from the employer had the employee not retired." Medicare Manual, *supra* § 50.1(H).

Again, we do not believe that this provision has any bearing on the question before us. This provision relates to retirees who return to active employment and who meet all the standard, employer-imposed requirements for obtaining employment-based health benefits. This is not the same as Paul, who remains retired and is simply subject to potentially having to respond for medical examinations and emergency duty as a condition of his receipt of health insurance benefits under the Benefits Act. Certainly, if Paul were to return to active employment with defendant and meet all the qualifications for obtaining health benefits through defendant based on that employment, then this provision would apply. Until then, however, it is irrelevant.

¶ 36                              C. Retained Employment Rights

¶ 37          In addition to arguing that Paul had "current employment status" with defendant because he was associated in a business relationship with defendant, plaintiffs also argue that Paul had "current employment status" with defendant because he retained employment rights in the industry in order to carry out police duties if recalled for emergency duty. We disagree.

¶ 38          As discussed above, under the applicable regulations, a person has "current employment status," even if he is not actively working, if he (1) retains employment rights in the industry, (2) has not had his employment terminated, if the employer provides the health insurance coverage, (3) is not receiving disability benefits from the employer for more than six months, (4) is not receiving disability benefits from Social Security, and (5) has group health plan coverage that is not provided under COBRA continuation coverage. 42 C.F.R. 411.104(a)(2)(ii) (2018). The regulations further provide:

          "(b) Persons who retain employment rights. For purposes of paragraph (a)(2) of this section, persons who retain employment rights include but are not limited to—

          (1) Persons who are furloughed, temporarily laid off, or who are on sick leave;

          (2) Teachers and seasonal workers who normally do not work throughout the year; and

          (3) Persons who have health coverage that extends beyond or between active employment periods; for example, based on an hours bank arrangement. (Active union members often have hours bank coverage.)" 42 C.F.R. 411.104(b) (2018).

¶ 39          Although plaintiffs argue that Paul retained employment rights in the industry, they make no argument whatsoever regarding the other requirements that must be met to have "current employment status" based on a retention of employment rights. One does not have "current employment status" simply because he has retained employment rights in his industry; rather, he

must meet all of the requirements identified in the regulations. Notably, with respect to at least two of these other requirements, the record affirmatively belies any claim that Paul met them. First, Paul's employment with defendant has certainly been terminated[6]—there is no dispute that he retired as a result of his line-of-duty injury and that the health insurance benefits he receives under the Benefits Act are post-employment benefits. See, *e.g.*, *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶¶ 16-17 (explaining that once a line-of-duty disability pension is awarded, a police officer's employment is terminated, and it is at that point that the officer becomes eligible for the postemployment benefits under the Benefits Act). Second, he has been receiving his disability pension benefits for much longer than six months. According to Paul's affidavit submitted in response to defendant's motion to dismiss, he was awarded his line-of-duty disability pension benefits in November 2005. In the complaint filed in May 2019, plaintiffs alleged that Paul was still receiving his line-of-duty disability pension benefits. For these reasons, even if it is true that Paul retained employment rights in the industry, plaintiffs' claim that he had "current employment status" with defendant on that basis fails.

¶ 40    We are also unconvinced that Paul has retained any employment rights in the industry. Although the regulations do not provide an exhaustive list of those who retain employment rights, Paul is not similarly situated to those listed as examples in one very important way: there is no intent by Paul to return to active employment with defendant or by defendant to return Paul to active employment. Paul's injury, his receipt of a line-of-duty disability pension, his receipt of postemployment health insurance benefits under the Benefits Act, and his long-term absence from employment with defendant all strongly indicate that there exists no expectation—by Paul or

---

[6]It should be noted that the fact that Paul is not actively employed by defendant does not, in and of itself, speak to whether he has "current employment status" with defendant, as that term is used in the Secondary Payer Act.

defendant—that Paul will return to work with defendant. The fact that Paul could be temporarily recalled for duty in an emergency situation does not change this, as his recall is a mere possibility, not an expectation. In contrast, the examples given in the regulations are all employees who would fully expect to return after a temporary break in active work—teachers, seasonal workers, furloughed employees, employees on sick leave, and union employees between assignments/jobs.

¶ 41                                  D. Additional Benefits Act Contentions

¶ 42        Plaintiffs next argue that because Margaret opted out of her Medicare Part B coverage from 2015 through part of 2018, her expenses were not payable from another source, such that her health insurance benefits were subject to reduction under the Benefits Act. This argument fails, of course, for the reasons discussed above. Under *Pyle*, Margaret's eligibility alone is sufficient to relieve defendant of its obligations to provide health insurance benefits for her under the Benefits Act. *Pyle*, 2012 IL App (5th) 110472, ¶ 27. Accordingly, because Margaret remained eligible for Medicare, despite the fact that she chose not to take advantage of that coverage, our conclusion that defendant was relieved of its obligation to pay her health insurance benefits under the Benefits Act remains unchanged.

¶ 43        Finally, plaintiffs contend that the Benefits Act requires defendant to "provide insurance for anything below basic coverage" and that "basic coverage" should be defined by the collective bargaining agreement between defendant and the patrol officers' union. According to plaintiffs, although defendant's obligation under the Benefits Act may be reduced by payments from another source, it cannot be completely eliminated. As discussed above, the plaintiff in *Pyle* made a similar argument—that Medicare benefits reduce but do not eliminate his benefits from the municipality— and the court rejected it. See *Pyle*, 2012 IL App (5th) 110472, ¶ 27. The *Pyle* court reached this conclusion by pointing out that if the municipality paid benefits for both the plaintiff and his wife,

but only the plaintiff became Medicare eligible, then the municipality's obligation to pay the plaintiff's insurance premiums would be reduced in its entirety, but its obligation for the plaintiff's wife's premiums would not be affected. *Id.* In this way, the *Pyle* court attempted to give effect to the term "reduce" in section 10(a)(1) of the Benefits Act, while also eliminating of the municipality's obligation to provide any benefits for Medicare eligible recipients.

¶ 44     We are not convinced that such a broad reading of the term "reduce" is correct. Reduce has a commonly understood meaning: "to diminish in size, amount, extent, or number." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/reduce (last visited Apr. 29, 2021) [**https://perma.cc/QBN2-ZXXL**]. Accordingly, the provision that benefits payable from another source "reduce" benefits payable under the Benefits Act suggests, in our opinion, that the municipality's obligation to provide coverage is diminished (*i.e.*, lessened), but not completely eliminated. Certainly, if the legislature intended to completely relieve a municipality of its obligation to provide coverage once a recipient had other coverage—no matter the quality or cost of that coverage—it was capable of stating as much.

¶ 45     The *Pyle* court attempted to give effect to the common understanding of the term "reduce" by stating that the municipality's total obligation to a recipient family is reduced (*i.e.*, lessened but not eliminated) when one family member is Medicare eligible, but others are not. We find this construction problematic in that it gives effect to the term "reduce" only when the municipality is obligated to provide coverage to more than one member of the family and where fewer than all members are Medicare eligible. In situations where there is only one recipient of municipal benefits under the Benefits Act and that recipient becomes eligible for Medicare, then, under *Pyle*, the municipality's obligation to provide coverage to that recipient is not reduced, it is completely eliminated. Likewise, in situations where multiple family members receive benefits under the

Benefits Act and they all become eligible for Medicare, then, under *Pyle*, the municipality's obligation to provide coverage to that family is not reduced, it is completely eliminated. We believe that the term "reduce" should be construed consistently across differing factual situations.

¶ 46        Nevertheless, we observe that although the Benefits Act calls for the benefits provided by a municipality to be reduced by benefits payable from another source, the Benefits Act fails to provide any instruction or guidance on how that reduction is to be calculated. Despite plaintiffs' contention, the Benefits Act does not provide for any minimum level of coverage or direct that a minimum level of coverage is defined by collective bargaining agreements, such that the municipality's obligation to provide benefits might be calculated by subtracting the coverage provided by a second source from the baseline minimum. Even if the standard coverage provided by a municipality to its employees is construed as the baseline level of coverage that must be provided to a recipient under the Benefits Act, the framework for comparing the value/quality of coverage under the municipality's plan with the value/quality of coverage from the second source is absent from the Benefits Act. This lack of framework leaves a plethora of unanswered questions, the answers to which are necessary to assess to what extent a municipality's obligation under the Benefits Act is reduced by a second source of coverage. Is the municipality's payment of premiums reduced by the premium cost of the second source? What if the second source does not require the payment of premiums, such as Medicare or Medicaid? Is the coverage provided by the municipality only required to supplement the coverage provided by the second source? To what extent? Is the amount of supplementation to be provided by the municipality determined by comparing the plans' deductibles, out-of-pocket maximums, lifetime maximums, coverage for certain procedures or examinations, or some function of all of these?

¶ 47        These are questions that cannot be answered consistently and fairly by a municipality across all of the recipients of its provided health insurance benefits, much less across the many municipalities in Illinois that are subject to the terms of the Benefits Act. The answers to these questions should be provided by the legislature, not this court. As a court, we are not permitted to read into a statute exceptions, limitations, or conditions that are not expressed in the plain language of the statute. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 23. To formulate and impose a framework by which to calculate the extent to which a municipality's obligation to provide health insurance benefits under the Benefits Act is reduced by coverage from a second source would go far beyond simply reading into a statute a limitation or condition. Accordingly, we decline to do so and conclude that, absent a legislatively approved framework under which we and municipalities can assess the extent to which a municipality's obligations under the Benefits Act is reduced by coverage from a second source, we must assume that the legislature intended a recipient's eligibility for Medicare to reduce to zero a municipality's obligation to provide health insurance benefits to that recipient.

¶ 48        In sum, because Paul is not actively working as an employee for defendant, is not associated with defendant in a business relationship, and has not retained employment rights or met the other requirements for current employment status on that basis, Paul does not have "current employment status" with defendant. Absent "current employer status" for Paul, Medicare is not a secondary payer for Margaret and Christopher, and defendant was entitled to take their eligibility for Medicare into consideration when determining whether their medical expenses were payable from another source. As a result, once Margaret and Christopher became eligible for Medicare, defendant was no longer required to provide health insurance benefits for them under the Benefits Act.

¶ 49                                    E. Wage Act

¶ 50        Because plaintiffs were not entitled to have defendant pay health insurance benefits under

the Benefits Act for Margaret and Christopher after they became eligible for Medicare, their claims

under the Wage Act also fail as a matter of law. The Wage Act provides a mechanism under which

employees may recover unpaid or underpaid "wages, final compensation, or wage supplements"

and damages from an employer who does not make timely payment of those monies pursuant to

the Wage Act.[7] 820 ILCS 115/14(a) (West 2014). It goes without saying that a person cannot

recover wages, final compensation, or wage supplements to which they were not entitled or that

the employer was not obligated to pay. Here, as discussed in depth above, plaintiffs were not

entitled to have defendant pay health insurance benefits under the Benefits Act for Margaret and

Christopher after they became eligible for Medicare. Accordingly, plaintiffs' Wage Act claims for

defendant's failure to pay Margaret's and Christopher's health insurance premiums following their

Medicare eligibility are precluded.

¶ 51        We note that the parties spend a fair amount of time debating whether the health insurance

benefits under the Benefits Act qualified as wages, final compensation, or wage supplements under

the Wage Act and whether plaintiffs were required to demonstrate the existence of an employment

contract or agreement between Paul and defendant. These contentions relate to the trial court's

supplementary conclusion that, pursuant to section 2-615 of the Code, plaintiffs failed to state a

cause of action under the Wage Act because the health insurance benefits under the Benefits Act

did not qualify as wages or wage supplements and because plaintiffs failed to allege the existence

of an employment agreement. Because we conclude that the trial court properly dismissed these

---

[7]As plaintiffs' counsel correctly pointed out during oral arguments, the Wage Act should not be confused with the Attorneys Fees in Wage Actions Act (705 ILCS 225/1 (West 2018)), which applies only to "wages earned and due and owing according to the terms of the employment" and not other employment benefits.

claims under section 2-619 of the Code because defendant was not obligated to pay Margaret's and Christopher's health insurance benefits under the Benefits Act following their Medicare eligibility, we need not address this alternative basis for dismissal under section 2-615 of the Code.

¶ 52    In sum, defendant was not obligated to provide health insurance benefits for Margaret and Christopher under the Benefits Act after they became Medicare eligible. Accordingly, plaintiffs' claims for mandamus, declaratory judgment, and relief under the Wage Act were properly dismissed with prejudice under section 2-619(a)(9) of the Code. We are very much aware of and sympathetic to the fact that this result will likely have a significant negative impact on the plaintiffs. We are, however, constrained by the law as reflected in the Secondary Payer Act, regulations related to the Secondary Payer Act, the Benefits Act, and case law interpreting all three. We are also bound by principles of statutory interpretation and the separation of powers between the judiciary and legislature. The trial court's decision and our decision reflect, in our opinion, the correct application of these laws and principles, as unfortunate as the result may be for the plaintiffs.

¶ 53    Finally, we recognize that plaintiffs allege that it is their medical providers who are seeking recoupment of costs from plaintiffs. However, to the extent that there remain premiums that defendant has paid on behalf of Margaret and Christopher but has not yet recouped from BCBS, we encourage the parties to negotiate and reach a compromise on the resolution of those premiums. In doing so, we urge defendant to take into consideration plaintiffs' good faith reliance on their coverage in seeking medical treatment.

¶ 54                                 III. CONCLUSION

¶ 55    For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 56    Affirmed.

---

**No. 1-20-0395**

---

| | |
|---|---|
| **Cite as:** | *McCaffrey v. Village of Hoffman Estates*, 2021 IL App (1st) 200395 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CH-6258; the Hon. Neil H. Cohen, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Joseph P. Selbka, of Pluymert, MacDonald, Hargrove & Lee, Ltd., of Hoffman Estates, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Hal R. Morris, Elizabeth A. Thompson, and Thomas A. Laser, of Saul Ewing Arnstein & Lehr LLP, of Chicago, for appellee. |

---